**SEARS, ROEBUCK AND CO., Plaintiff,**

v.

**SEARS FINANCIAL NETWORK, INC., et al., Defendants.**

**Civ. A. No. 83–2330.**

United States District Court, District of Columbia.

Nov. 2, 1983.

Richard C. Browne, Debevoise & Liberman, Washington, D.C., for plaintiff.

Neil H. Ruttenberg, Falls Church, Va., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THOMAS F. HOGAN, District Judge.

### INTRODUCTION

This matter is before the Court on plaintiff's motion for a preliminary injunction. Plaintiff brought this action for unfair competition and trade name and service mark infringement to its well-known name and mark SEARS pursuant to Sections 32 and 43(a) of the Lanham Act (the Federal Trademark statute), 15 U.S.C. §§ 1114, 1125(a) (1976), and common law.

The Court conducted a hearing on this matter. Based upon the plaintiff's motion for preliminary injunction, the memorandum in support thereof, the defendants' opposition thereto, the affidavits and exhibits filed by both parties, the entire record herein, and the argument of counsel, on October 19, 1983, this Court issued an order granting plaintiff's motion for a preliminary injunction. The following findings of fact and conclusions of law supplement the Court's previous oral findings of fact and conclusions of law; they are made without prejudice to either party in further proceedings in this case.

### FINDINGS OF FACT

Plaintiff Sears, Roebuck and Company (Sears) has been using the name SEARS in selling its goods and services since it originated in 1886, making its name and mark one of the oldest in American business. (Weimer Aff. Exh. 1.) Plaintiff holds several United States trademark registrations for its mark SEARS; it renewed its primary registration in 1982 (Complaint, Exhs. D and E). Over the course of this century plaintiff Sears has continued to expand its services to the point where it is the world's largest retailer and now offers over 100,-000 products. (*Id.* ¶ 7.) Sears has vastly expanded from its originating roots as a consumer retail oriented business. Today, Sears Merchandise Group includes such recognized holdings as Allstate Insurance, Coldwell Banker Real Estate, and Dean Witter Reynolds Financial Services; enabling plaintiff to offer a broad range of financial services, including loans, insurance, real estate, securities and mortgage banking. (*Id.* Exh. 1). Plaintiff states that due to its longstanding relationship with the American public, the name and mark SEARS has become identified with plaintiff as representing quality goods and services at reasonable prices.

At the end of 1982 plaintiff's 830 retail stores and 2300 Sears catalog offices employed over 300,000 people and served over 36 million customers, providing Sears with a net income of $861 million from sales (including its subsidiaries) of $30.02 billion. (Weimer Aff. Exh. 1.)

The conflict in this case concerns plaintiff's financial services holdings and it is only this aspect of its business that requires further discussion. In 1911 plaintiff became one of the first major retailers to extend credit services to its customers, although at first it did so on a limited line of products. (Weimer Aff. ¶ 1.) By 1941 all of plaintiff's merchandise offered was made available for purchase on credit. (*Id.*) Plaintiff offered financing for home improvements in 1936 and in 1956 extended its services under its Modernizing Credit Plan which enabled customers to obtain long term financing for Sears merchandise purchased for home improvements such as roofing, remodeling construction, kitchen cabinets, appliances, countertops, flooring, windows and lighting. (*Id.*) Over the years Sears, Roebuck and Co. has extensively advertised its credit services so that by 1982 it employed over 16,000 people engaged in credit related jobs to handle its more than 24 million active Sears Credit Card holders, who account for over 50% of Sears' sales. (Weimer Aff. ¶ 1.)

Through its holdings Sears has been involved in many other aspects of providing financial services. Plaintiff has been in the mortgage banking business since 1958 at which time it acquired an interest in a savings and loan in California, which it later named Allstate Savings and Loan. (Butler Aff. ¶ 2.) Plaintiff has since expanded its mortgage banking services through subsidiaries Allstate Enterprise Mortgage Corporation (starting in 1972), Allstate Finance (starting in 1977) and Coldwell Banker Residential Mortgage Services (starting when acquired in 1981) (*Id.*). Sears offers mortgage banking services throughout the nation and services the metropolitan Washington, D.C. area through its Coldwell Banker Residential Mortgage Office in Northern Virginia (*Id.*).

Sears expanded its financial services operations in 1981 when it organized its Allstate Insurance, Coldwell Banker Real Estate and Dean Witter Reynolds Financial Groups under the name Sears Financial Network, which includes thousands of the offices of the above-mentioned groups as well as Sears Financial Network centers which offer consumers financial services under one roof at many Sears retail stores. (Butler Aff. ¶ 4.) There will be 130 Sears Financial Network centers in operation by the end of 1983, with an additional 150 planned by the end of 1984. (*Id.*) There have been eight such centers in operation in the metropolitan Washington, D.C. area since July, 1982 with an additional four planned to open by the end of this year. (*Id.*) In July, 1982, Sears began a national advertising campaign for its Sears Financial Network centers through television, radio, magazines, newspapers, direct mail, catalogs and other media; including the Washington, D.C. area for its eight centers. (*Id.*) By the end of August, 1983 plaintiff had spent over $11 million in advertising its subsidiaries Allstate, Coldwell Banker and Dean Witter Reynolds as "members of the Sears Financial Network." (*Id.* Exh. 1.)

In April, 1983, defendant Christopher A. Paterson incorporated his mortgage placement assistance business in the District of Columbia. (Paterson Aff. ¶ 3.) In choosing the name of his new business, Mr. Paterson allegedly was "reminded of an old romantic interlude with Patricia Sears and his promise at their parting to remember her through the years." (Opposition to Motion for Preliminary Injunction ¶ 2.) Thus defendant named his new corporation "Sears Financial Services." (*Id.*) Defendant proceeded to reserve the name "Sears Financial Services, Inc." in 28 states. (Plaintiff's Complaint, Exh. C.) Defendant has placed advertisements in the *Washington Post* in which the SEARS name appears in a bold type style very similar to that of plaintiff. (Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction, page 3.)

In June, 1983, plaintiff first learned that defendants were originating residential real estate loans in the Washington, D.C. area under the name Sears Financial Services, Inc., when counsel for defendants sent a letter to plaintiff Sears, Roebuck and Co. threatening litigation, unless plaintiff stopped using its name SEARS in con-

nection with the financial services it offers. (*Id.*, Exh. B.) The letter also stated that plaintiff's use of the name SEARS in connection with financial services causes "confusion to its [defendants] prospective customers." (*Id.*). In July, 1983, counsel for defendants sent another letter to plaintiff's counsel repeating the demand that plaintiff stop using its name SEARS in connection with financial services. (*Id.*, Exh. C.) The parties met in August, 1983 in an unsuccessful attempt to settle the dispute and this action for unfair competition and trade name, trademark and service mark infringement resulted. (Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction, p. 11.)

## CONCLUSIONS OF LAW

This Court has jurisdiction over the subject matter and the parties under Sections 39 and 43(a) of the Federal Trademark Act of 1946, as amended [15 U.S.C. §§ 1121 and 1125(a)], as well as the provisions of the Judicial Code [28 U.S.C. §§ 1331(a), 1332(a) and (c), 1337(a) and (c), 1338(a) and (b)]. Plaintiff Sears brought this action alleging unfair competition and trade name, trademark and service mark infringement. In support thereof, Sears relied on a similar unfair competition and trademark infringement case which was recently heard in this district, *American Association for the Advancement of Science (AAAS) v. Hearst Corp.*, 498 F.Supp. 244 (D.D.C.1980).

■ The law of unfair competition prohibits anyone from giving his product a "false designation of origin" or marking it with "words or other symbols tending falsely to describe or represent the same." 15 U.S.C. § 1125(a). The elements of a cause of action for unfair competition are 1) a likelihood of confusion; and 2) secondary meaning, *i.e.*, an association in the minds of the buying public between the name of the product and the product itself or the source. *Id.* at 261–62.

■ To prevail on its claim of trade name, trademark and service mark infringement under 15 U.S.C. § 1114(1), plaintiff must show 1) that it owns a valid trademark, 2) that it is distinctive or has acquired secondary meaning, and 3) that there is a likelihood of confusion. *AAAS v. Hearst*, 498 F.Supp. at 254. The elements of both claims will be discussed together.

■ In order to prevail on its claims under 15 U.S.C. § 1114(1) and 1125(a), the plaintiff must establish that the defendants' use of the name and mark "SEARS" creates a "likelihood of confusion." *Toys R US, INC. v. Canarsie Kiddie Shop, Inc.*, 559 F.Supp. 1189, 1195 (E.D.N.Y.1983). *See Lambda Electronics v. Lambda Technology, Inc.*, 515 F.Supp. 915, 924 (S.D.N. Y.1981). The crucial focus of inquiry on the issue of likelihood of confusion is the effect of defendants' mark on prospective purchasers. *AAAS v. Hearst*, 498 F.Supp. at 258; *McGregor-Doninger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1134 (2d Cir.1979). In determining whether there is a likelihood of confusion the court will consider "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Toys R US, INC.*, 559 F.Supp. at 1195; *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44 (2nd Cir.1978) cert denied 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). The Court must also balance the interests of the senior user, the junior user, and the public consumer. *Lambda Electronics, Inc. v. Lambda Technology, Inc.*, 515 F.Supp. at 924.

■ In determining the likelihood of confusion it is not necessary to show actual evidence of confusion. Such evidence is difficult to obtain; but actual evidence of confusion is substantial proof of the existence of the likelihood of confusion. *AAAS v. Hearst*, 498 F.Supp. at 258; *James Burrough, Ltd. v. Sign of the Beefeater, Inc.*, 572 F.2d 574, 578 n. 3 (7th Cir.1978). In the case before this Court evidence of actual confusion exists in that the defendants have conceded that there is "confusion to its prospective customers" (Complaint, Exh. B), citing as an example a telephone

operator who gave one of its customers the number of Sears, Roebuck and Co. (*Id.,* Exh. C.)

■ In assessing the likelihood of confusion, criteria considered by the courts include:

1) the strength of the senior user's mark (secondary meaning);

2) the degree of similarity between the two marks;

3) the proximity of the products; and

4) the intent of the junior user.

*Toys R US, INC. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. at 1195–96; *Polaroid Corp. v. Polaroid Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

1. Strength of the Senior User's Mark

■ In determining the strength of the user's mark an important consideration is whether the trade name or mark has acquired secondary meaning. In finding secondary meaning, the following factors are considered:

1) the duration and continuity of use of the mark;

2) the extent of advertising and promotion and amount of money spent thereon;

3) figures showing sales of plaintiff's product or the number of people who have viewed it; and

4) identification of plaintiff's and defendant's respective markets.

*AAAS v. Hearst,* 498 F.Supp. at 257.

■ As the above discussion reveals, through plaintiff's continued use of its name and mark for nearly one hundred years, and billions of dollars spent in advertising,[1] the name and mark SEARS has come to signify plaintiff Sears, Roebuck and Co. as the source of goods and services marketed under the SEARS name. (Weimer Aff., Exh. 1.) Plaintiff has stores throughout the country, serves over 36 million regular customers, and has more than 24 million credit card holders. (*Id.* ¶ 7.) While defendant Sears Financial Services has proffered little evidence on the subject, plaintiff Sears has gone far beyond its burden, producing substantial evidence of SEARS' secondary meaning. On the basis of the foregoing, it is clear that through the plaintiff's marketing and advertising efforts the SEARS name and mark has acquired secondary meaning in the minds of the public in relation to providing many different goods and services.

2. Degree of Similarity Between the Two Marks

In comparing the marks, the focus of concern is not on similarity per se, but rather whether a similarity exists which is likely to cause confusion. *Toys R US, INC. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. at 1197. The test is thus whether "the impression which the infringing mark makes upon the consumer is such that he is likely to believe the product is from the same source as the one he knows under the trademark." *McGregor-Doninger, Inc. v. Drizzle, Inc.,* 599 F.2d at 1133. In making this determination, courts consider the general impression as a whole that the mark creates. *AAAS v. Hearst,* 498 F.Supp. at 259.

■ Turning to the two marks involved in the case before this Court, various similarities are readily apparent. In both marks, the dominant word is the name SEARS. Defendants emphasize the word SEARS in relation to the other words in its name by using larger and bolder type that is substantially similar to the type used by plaintiff. Defendants' use of the words Financial Services, Inc., contrasted to Financial Network, adds further to the confusion in that Sears has been engaged in the business of providing financial services for over seventy years, and recently has been marketing and advertising financial services under the name Sears Financial

---

**1.** In 1982 alone, plaintiff spent nearly $1 billion in advertising in catalogs, direct mail, newspapers, magazines, television, radio and other media; more than $277 million was spent for catalog advertising and over $719 million spent for all other advertising. (Weimer Aff., ¶¶ 5 and 6.)

Network. Defendant did not start doing business under the name Sears Financial Services until April, 1983, many months after plaintiff began advertising locally. The marks are sufficiently similar to create the probability that some consumers might believe that the two marks originated from the same source or that some consumers might mistake one mark for the other when seeing or hearing the mark alone.

### 3. The Proximity of the Products

■ Where the products or services in question are competitive, the likelihood of consumer confusion increases. *Toys R US, INC. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. at 1198. Both parties in the instant case offer financial services, specifically mortgage banking. The plaintiff and defendants are therefore in direct competition. Plaintiff currently has plans to open four additional Sears Financial Networks centers in the metropolitan Washington, D.C. area as part of its effort to have over 280 such centers in operation throughout the nation by late 1984. Besides operating his Washington, D.C. business, defendant has incorporated the name Sears Financial Services in 28 states. If there is no distinction made between plaintiff's and defendants' operations, consumers might assume that the two are related companies. *See McGregor-Doninger, Inc. v. Drizzle, Inc.,* 599 F.2d at 1135–36.

### 4. Intent of the Junior User

The intent of the junior user in choosing his mark and name is an important factor in determining the likelihood of confusion if it is wrongful on the part of the defendants. In his affidavit, defendant Christopher Paterson stated as to how he arrived at naming his business:

> As I organized the business, I first decided to incorporate. I requested and received the required forms from the District of Columbia. Realizing that the Corporation needed a name, I began considering my options. I had long ago been smitten with a Miss Patricia Sears and, upon parting, promised to memorial-

ize her through one of my endeavors. Remembering this promise, I named the company Sears Financial Services.

(Paterson Aff. ¶ 4.)

■ This Court has difficulty in accepting defendants' version of the origination of his corporate name. In view of the fact that plaintiff has been doing business and advertising under the Sears Financial name and upon considering the related services offered by the parties, it is hard to believe that the defendant was unaware of the plaintiff's use of the Sears Financial Network name. At this juncture of the case, it can thus be preliminarily inferred that the defendant's intent was to trade off the plaintiff's well-known name and mark SEARS.

Even though the names Sears Financial Services and Sears Financial Network are not identical, by utilizing the phrase "Sears Financial" in a mark employed to provide services so closely related to plaintiff's, there is a strong likelihood that consumers will be attracted to the defendants' mark believing that the defendants' business has some connection with the plaintiff. The defendants' mark will thereby attract customers as a consequence of the strong reputation built by the extensive advertising and marketing efforts of the plaintiff. The defendants' use of a name so similar in sound and association to that of plaintiff's was an attempt to trade on the plaintiff's good will. When viewing defendants' mark by itself, there is a strong likelihood that some consumers might confuse it with plaintiff's.

In light of the foregoing, this Court preliminarily finds that both elements of a cause of action for unfair competition, pursuant to 15 U.S.C. 1125(a), a likelihood of confusion and secondary meaning, exist as to the SEARS name and mark. Furthermore, plaintiff has shown that it is the holder of several registrations for its name and mark SEARS, which together with the elements found immediately above, satisfy the requirements of a cause of action for trade name, trademark and service mark infringement under 15 U.S.C. § 1114(1).

Plaintiff also contends that it is entitled to relief on the ground that defendants' actions are likely to mislead persons into believing that defendants' services originate from or have been endorsed by the plaintiff, thus constituting unfair competition at common law. In *Yale Electric Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir.1928), a common law unfair competition case, the court upheld an injunction against use of the Yale lock trademark on flashlights. Judge Learned Hand wrote:

> A merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury even though the borrower does not tarnish it, or direct any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mark ... [U]nless the borrower's use is so foreign to the owner's as to insure against an identification of the two, it is unlawful.

26 F.2d at 974. In the case before this Court the defendants may have misappropriated plaintiff's good will to their own use by linking plaintiff's name and advertising to defendants' business. Accordingly, defendants' actions could be proven to be unlawful under common law unfair competition principles.

## Preliminary Injunctive Relief

When a plaintiff seeks a preliminary injunction it bears the burden of satisfying the four criteria established by the Court of Appeals in *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977); *Virginia Petroleum Jobbers Association v. Federal Power Commission*, 259 F.2d 921 (D.C.Cir.1958):

1) That the plaintiff has demonstrated a likelihood of success on the merits;

2) That plaintiff would be irreparably harmed in the absence of preliminary injunctive relief;

3) That an injunction would not substantially harm other interested parties; and

4) That public interest would not be significantly harmed by an injunction.

## Likelihood of Success on the Merits

As a result of the foregoing discussion, this Court concludes that plaintiff Sears has shown a strong likelihood of success on the merits. Plaintiff has demonstrated that the likelihood of confusion is present in that defendant's mark is nearly identical to plaintiff's, defendants and plaintiff are in direct competition, and defendants have shown an intent to trade off plaintiff's name SEARS.

## Irreparable Injury

Trademark infringement and unfair competition are, by their very nature, activities that cause irreparable harm. *AAAS v. Hearst*, 498 F.Supp. at 262. To prevent irreparable harm to Sears by the dilution of the distinctiveness of its trademark, the loss of control of its reputation and the diminishment of its good will, a preliminary injunction must be granted.

## Harm to Other Parties

The issuance of an injunction will not substantially harm defendants because defendants will be able to continue to operate their business, though not under the present name and mark SEARS. Defendants will suffer some hardships in complying with the injunction; however, this must be balanced against other factors, including: 1) the public confusion created by defendants' actions; 2) plaintiff's loss of control over its reputation; and 3) defendants have apparently been intentionally trading off plaintiff's name and mark SEARS. Additionally the Court will require a substantial bond to protect the defendant in the event plaintiff is not ultimately successful.

**Public Interest**

■ It is within the public interest for the Court to take action to prevent public deception and confusion over the source or origin of businesses with which the public deals. As discussed *supra*, the Court finds that the plaintiff has satisfied the criteria as dictated by *Virginia Petroleum Jobbers Association v. Federal Power Commission*, 259 F.2d at 921.

For the foregoing reasons, and in accordance with the earlier issued Order, plaintiff's motion for preliminary injunction is GRANTED.