**JORDACHE ENTERPRISES, INC.,**
Plaintiff-Appellant,

v.

**HOGG WYLD, LTD., Susan Duran,
Marsha Stafford and Oink, Inc.,**
Defendants-Appellees.

No. 85–2254.

United States Court of Appeals,
Tenth Circuit.

Sept. 14, 1987.

Donald A. Kaul, of Brownstein, Zeidman and Schomer, Washington, D.C., for plaintiff-appellant.

Donald W. Garland (Thomas F. Blueher and Leonard J. DeLayo, Jr., on the brief), of DeLayo, Olson & Blueher, P.A., Albuquerque, N.M., for defendants-appellees.

Before McKAY, MOORE and TACHA, Circuit Judges.

TACHA, Circuit Judge.

This case, a trademark infringement action brought against a manufacturer that identifies its blue jeans for larger women with a smiling pig and the word "Lardashe" on the seat of the pants, reminds us that "you can't make a silk purse out of a sow's ear."[1] Appellant Jordache Enterprises, Inc., alleges error in a district court decision finding no likelihood of confusion between the Jordache and Lardashe trademarks and finding no violation of New Mexico's antidilution statute. We affirm.

Appellant, a New York corporation formed by three immigrant brothers in 1978, is the fourth largest blue jeans manufacturer in the United States. It produces and markets all types of apparel for men, women, and children, the principal product being designer blue jeans. Most items are identified by one of appellant's several registered trademarks, including the word "Jordache" printed in block letters, the word "Jordache" printed in block letters and superimposed over a drawing of a horse's head, and a drawing of a horse's head alone. Some products are identified by the word "Jordache" written in script lettering, a mark which has not been registered.

An intensive advertising campaign has created great customer awareness of Jordache products. In 1984, for example, appellant spent about thirty million dollars annually on television, radio, newspaper, and magazine advertisements and other promotional efforts. The message of this advertising has been that Jordache jeans convey "the look of the good life." Jordache jeans are now sold in retail outlets throughout the world.

Appellant has licensed Shaker Sport to manufacture and market Jordache jeans for larger women. Shaker Sport has expended substantial resources in advertising these jeans, and it had sold between 33,000 and 60,000 pairs by 1985.

In 1984, appellees Marsha Stafford and Susan Duran formed Hogg Wyld, Ltd., now Oink, Inc., for the purpose of marketing designer blue jeans for larger women. In an operation conducted out of their homes in New Mexico, the two women designed a product, selected a manufacturer, and ultimately sold over 1,000 pairs of jeans. Sales were limited to specialty shops in several southwestern states and to acquaintances or others who heard of the product. The women have not directly advertised their jeans, although several retailers have done so.

The name of the Oink, Inc. blue jeans gave rise to this suit. Names suggested at one time or another for the jeans by Stafford, Duran, or others, included "Thunder Thighs," "Buffalo Buns," "Seambusters," "Rino Asirus," "Hippo Hoggers," "Vidal Sowsoon," and "Calvin Swine." Other names and marks were suggested as a take-off on Stafford's childhood nickname, "lardass." This nickname inspired ideas such as "Wiseashe" with a picture of an owl, "Dumbashe" with a picture of a donkey, "Horsesashe" with a picture of a horse, and "Helium Ash" with a picture of

---

1. The first appearance of this proverb in its present form is attributed to Jonathan Swift. See J. Swift, *A Complete Collection of Genteel and Ingenious Conversation, According to the* *Most Polite Mode and Method Now Used at Court, and in the Best Companies of England* 181 (London 1738).

a balloon. The women decided to name their jeans "Lardashe."

Appellant first became aware of Lardashe jeans after an Albuquerque TV station broadcast a news segment, which was also broadcast nationally by NBC, highlighting the new product. Jordache brought suit against Stafford, Duran, and their corporation, alleging trademark infringement in violation of the Lanham Trade-Mark Act, 15 U.S.C. §§ 1051–1127, the New Mexico Trademark Act, N.M.Stat. Ann. §§ 57–3–1 to –14 (1987), and common law. The district court, after a three-day bench trial, held that no trademark infringement had occurred on any of the alternative claims. *Jordache Enters. v. Hogg Wyld, Ltd.*, 625 F.Supp. 48 (D.N.M. 1985). Jordache now appeals to this court.

## I.

The Lanham Act prohibits the unauthorized use of a reproduction, copy, or imitation of a registered trademark in a way that "is likely to cause confusion" with the registered mark. 15 U.S.C. § 1114(1)(a); *see also* 15 U.S.C. § 1125(a) (similar test for infringement of an unregistered trademark by a junior user). "Confusion occurs when consumers make an incorrect mental association between the involved commercial products or their producers." *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, — U.S. —, 107 S.Ct. 2971, 2995, 97 L.Ed.2d 427 (1987) (Brennan, J., dissenting). This court has identified several factors, originally set forth in Restatement of Torts § 729 (1938), that are relevant to whether there is a likelihood of confusion between two marks:

"(a) the degree of similarity between the designation and the trade-mark or trade name in
　(i) appearance;
　(ii) pronunciation of the words used;
　(iii) verbal translation of the pictures or designs involved;
　(iv) suggestion;
(b) the intent of the actor in adopting the designation;

(c) the relation in use and manner of marketing between the goods or services marketed by the actor. and those marketed by the other;
(d) the degree of care likely to be exercised by purchasers."

*Beer Nuts, Inc. v. Clover Club Foods Co. (Beer Nuts II)*, 805 F.2d 920, 925 (10th Cir.1986) (quoting *Beer Nuts, Inc. v. Clover Club Foods Co. (Beer Nuts I)*, 711 F.2d 934, 940 (10th Cir.1983)).[2] This list is not exhaustive. All of the factors are interrelated, and no one factor is dispositive. *Id.* The party alleging infringement has the burden of proving likelihood of confusion. *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1243 (9th Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985).

The district court examined these factors and concluded that there is no likelihood of confusion between the Jordache trademark and the Lardashe trademark. 625 F.Supp. at 53–54. Likelihood of confusion is a question of fact that we review under the clearly erroneous standard. *Amoco Oil Co. v. Rainbow Snow, Inc.*, 809 F.2d 656, 661 (10th Cir.1987); *see also Beer Nuts II*, 805 F.2d at 923 n. 2. Appellant contends that the district court erred as a matter of law in its consideration of several of the factors and that, in any event, the court's findings are clearly erroneous.

## A.

The similarity between the marks in appearance, pronunciation of the words used, translation of the designs used, and suggestion or meaning is the first factor to consider in determining whether there is a likelihood of confusion. The district court found that the Jordache mark and the Lardashe mark are not confusingly similar. Appellant argues that the court employed an improper legal construction of "suggestion" or "meaning" in reaching this result. Even if we were to reject this argument, appellant would have us hold the finding of no similarity to be clearly erroneous.

---

2. The common law test for likelihood of confusion is the same as the Lanham Act test. *Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 558 (10th Cir.1984).

Trademarks may be confusingly similar if they suggest the same idea or meaning. For example, this court has held that a trademark consisting of an overflowing stein with the words "Brew Nuts" conveys the same meaning as a trademark consisting of the words "Beer Nuts." *Beer Nuts II*, 805 F.2d at 926. The district court in the present case found that "the two marks suggest dissimilar images or concepts." 625 F.Supp. at 53. Appellant alleges that the district court erred as a matter of law in its application of this factor by attributing a meaning of "class" or "style" to the Jordache mark. According to appellant, since the word "Jordache" has no inherent meaning, the district court necessarily must have relied upon a legally incorrect understanding of "suggestion" or "meaning" in order to find no similarity between the marks.

This argument mischaracterizes the findings of the district court. The court found the *words* "Jordache" and "Lardashe" similar, but not the horse and pig *designs*. The court did not find the word "Jordache" has an inherent meaning. Rather the "meaning" described by the court referred to the "relatively subtle and refined" horse design that is employed in the Jordache trademarks. The district court did not attach an improper "meaning" to the Jordache marks.

Appellant further argues that the district court erred in finding the trademarks are not confusingly similar. Similarities between trademarks are to be given more weight than differences. *Beer Nuts II*, 805 F.2d at 925. The district court found that "[t]he overall differences between the two marks greatly overcomes the similarity in spelling and pronunciation of the names Jordache and Lardashe." 625 F.Supp. at 53.

■ Our review of the evidence shows that the marks, and their suggested images, are obviously different. Many of the Jordache jeans are identified by a small brown patch with the word "Jordache" written in white in block letters with a gold horse's head superimposed over the lettering. In other instances, the patch is white

with blue block lettering and no horse. Sometimes "Jordache" is written in script or only the horse's head is used. In contrast, the Lardashe jeans have a large, brightly colored pig head and two hooves, giving the appearance that a pig is peering over the back pocket. The word "Lardashe" is written in script beneath the pig's head, below which is an upside down embroidered heart. *See* appendix. We agree with the district court that the "striking, brightly colored, and far from subtle" pig design is "humorous, or 'cute,' or facetious." 625 F.Supp. at 53. Thus, while the similarity of the words used in the mark would support an inference of likelihood of confusion, we agree with the district court's finding that the striking dissimilarities in the designs used in the marks greatly outweigh any similarities.

### B.

The intent of a party in selecting a trademark is another factor in determining whether there is a likelihood of confusion. The district court found the appellees' "intent was to employ a name that, to some extent, parodied or played upon the established trademark Jordache"; appellees "did not intend to 'palm off' their jeans as Jordache jeans; that is, to confuse the public into believing it was buying a Jordache product." *Id.* at 52. Appellants contend the court erred in its analysis of intent and the relevance of parody.

The "deliberate adoption of a similar mark may lead to an inference of intent to pass off goods as those of another which in turn supports a finding of likelihood of confusion." *Beer Nuts II*, 805 F.2d at 927. "The proper focus is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 431 (5th Cir.1984); *accord* Restatement of Torts § 729 comment f at 594–95 (1938). A conscious choice of a mark similar to a mark already established in the marketplace usually supports a finding of a likelihood of confusion "because the court presumes that [the alleged infringer] 'can accomplish his purpose: that is, that the

public will be deceived.'" *Beer Nuts I,* 711 F.2d at 941 (quoting *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 354 (9th Cir. 1979)).

Given the unlimited number of possible names and symbols that could serve as a trademark, it is understandable that a court generally presumes one who chooses a mark similar to an existing mark intends to confuse the public. However, where a party chooses a mark as a parody of an existing mark, the intent is not necessarily to confuse the public but rather to amuse. *See* Note, *Trademark Parody: A Fair Use and First Amendment Analysis,* 72 Va.L. Rev. 1079, 1079–80 n. 4 (1986) [hereinafter Note, *Trademark Parody* ] (the purpose of a parody is "to create a comic or satiric contrast to a serious work").

In one sense, a parody is an attempt "to derive benefit from the reputation" of the owner of the mark, *Sicilia,* 732 F.2d at 431, if only because no parody could be made without the initial mark. The benefit to the one making the parody, however, arises from the humorous association, not from public confusion as to the source of the marks. A parody relies upon a difference from the original mark, presumably a humorous difference, in order to produce its desired effect.

"Now everything is funny as long as it is happening to somebody Else, but when it happens to you, why it seems to lose some of its Humor, and if it keeps on happening, why the entire laughter kinder Fades out of it." W. Rogers, *Warning to Jokers: Lay Off the Prince,* in *The Illiterate Digest,* I–3 *The Writings of Will Rogers* 75 (1974). The same is true in trademark law. As McCarthy writes, "No one likes to be the butt of a joke, not even a trademark. But the requirement of trademark law is that a likely confusion of source, sponsorship or affiliation must be proven, which is not the same thing as a 'right' not to be made fun of." 2 J. McCarthy, *Trademarks and Unfair Competition* § 31:38 at 670 (2d ed. 1984).

▮ Of course, a parody of an existing trademark can cause a likelihood of confusion. For example, where two marks are confusingly similar, or where there is evidence of actual confusion, a likelihood of confusion can exist despite the intent to create a parody. Our single concern here, however, is whether an intent to parody an existing trademark supports an inference of a likelihood of confusion under the reasoning that one who chooses a mark similar to an existing mark intends to confuse the public. *See Beer Nuts II,* 805 F.2d at 927. We hold that it does not. An intent to parody is not an intent to confuse the public.

The district court found the appellee's explanation for their adoption of the Lardashe mark not credible.[3] The court found

---

3. Stafford and Duran testified at trial that they had not heard of Jordache jeans when they selected the Lardashe name. Stafford explained that "Lardashe" was meant to be a more polite version of "lardass," her childhood nickname. She testified to the meaning of "ashe" as an alternative spelling by saying that "if you'll look in your Bible, it's the goddess of fertility. It's the goddess of womanhood which I've known about for a long time and which meant quite a bit to me." Further testimony revealed that Stafford was referring to several goddesses, but was unable to locate any of them in the Bible. Finally, Stafford testified that the "e" at the end of "Lardashe" is meant to appear like a pig's tail when the word is written in script.

"In cases where defendant concocts an elaborately fantastic and strained scenario of how it 'coincidentally' hit upon its symbol, judges are not amused when asked to swallow fantastic fabrications about coincidental, unknowing usage." 2 J. McCarthy, *Trademarks and Unfair*

*Competition* § 23:35 at 156 (2d ed. 1984) (see cases cited in n. 8 and in 1986 supplement). In one case, Sears, Roebuck, & Co., the owner of the trademark "SEARS" for its Sears Financial Network sued an individual who had established a corporation called Sears Financial Services. The defendant explained how he had chosen that particular name: "Realizing that the Corporation needed a name, I began considering my options. I had long ago been smitten with a Miss Patricia Sears and, upon parting, promised to memorialize her through one of my endeavors. Remembering this promise, I named the company Sears Financial Services." *Sears, Roebuck & Co. v. Sears Fin. Network,* 576 F.Supp. 857, 863 (D.D.C.1983). The court said that it had difficulty in accepting this story, and "it can thus be preliminarily inferred that the defendant's intent was to trade off the plaintiff's well-known name and mark SEARS." *Id.*

Similarly, the district court in this case correctly looked beyond appellees' stated explana-

that their real intent was to parody Jordache. 625 F.Supp. at 52. After examining the record, we hold the district court's findings are not clearly erroneous. We therefore reject appellant's challenge to the district court's refusal to infer a wrongful intent.

### C.

Another factor to be considered in determining whether there is a likelihood of confusion is "the degree of care likely to be exercised by purchasers." *Beer Nuts II,* 805 F.2d at 925. The district court found that customers are likely to exercise a high degree of care in purchasing clothing that costs between fifteen and sixty dollars. 625 F.Supp. at 53. Appellant says that "[o]ne can just as easily surmise" that a lesser degree of care will be used in selecting a pair of blue jeans. Brief of Appellant at 27. Appellant has offered only a guess, not any evidence of the degree of care that would satisfy its burden of proof. The district court's finding of a high degree of care is not clearly erroneous.

### D.

Obviously, the best evidence of a likelihood of confusion in the marketplace is actual confusion. *Standard Oil Co. v. Standard Oil Co.,* 252 F.2d 65, 74 (10th Cir.1958). Appellant offered evidence that it believed showed actual confusion, but the district court did not find this evidence compelling. Appellant challenges the court's findings.

Paul Ornstein, Executive Vice President of Shaker Sports, testified that he was called by associates who asked whether Lardashe jeans were affiliated with Jordache. The district court ruled that this

testimony was hearsay and that even if it was admissible, it was not evidence of actual confusion by consumers in the marketplace. 625 F.Supp. at 54. We hold that Ornstein's testimony was admissible because it was offered to show the then existing state of mind of Ornstein's associates. *See* Fed.R.Evid. 803(3).[4]

Although Ornstein's testimony was admissible, the district court correctly gave it little weight. McCarthy advises, "The better view would seem to be that while [customer] enquiry evidence is admissible and relevant, standing alone with no other evidence it is insufficient proof of actual confusion." 2 J. McCarthy, *Trademarks and Unfair Competition* § 23:2(B) at 54 (2d ed. 1984). We hold that even when combined with other evidence inquiries to the plaintiff about the source of a product are of comparatively little value.

Appellant also offered a survey of seventy people contacted in the Student Union building on the University of New Mexico campus as evidence of actual confusion. The district court afforded little weight to this survey. 625 F.Supp. at 54. We have acknowledged that public recognition surveys can be used to show actual confusion. *Standard Oil Co.,* 252 F.2d at 75. However, the evidentiary value of such surveys depends on the relevance of the questions asked and the technical adequacy of the survey procedures. *See id.*

In *Beer Nuts I,* this court observed:

In evaluating similarity, "[i]t is axiomatic in trademark law that 'side-by-side' comparison is not the test." *Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 822 (9th Cir.1980); *American Home Products Corp. v. Johnson Chem-*

tion in determining their true purpose in selecting the Lardashe mark. Indeed, Duran testified that the reason for rejection of "Horsesashe" with a picture of a horse's head as a possible mark was that the appellees wanted to stay away from Jordache's horse mark. This awareness of the Jordache mark belies Stafford's explanation for choosing "Lardashe" and supports the district court's finding that "Lardashe" was intended to be a parody.

**4.** We recognize that other courts have considered the admissibility of customer inquiries

and have reached somewhat different results. *See Armco, Inc. v. Armco Burglar Alarm Co.,* 693 F.2d 1155, 1160 n. 10 (5th Cir.1982) (testimony is not hearsay because it is not offered to establish the truth of the matter asserted, but even if it was hearsay, it would be admissible to show an existing state of mind); *Vitek Sys., Inc. v. Abbott Laboratories,* 675 F.2d 190, 193 (8th Cir. 1982) (testimony is inadmissible hearsay entitled to little weight).

*ical Co.*, 589 F.2d 103, 107 (2d Cir.1978); *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976); *Fotomat Corp. [v. Cochran ]*, 437 F.Supp. [1231] at 1244 [D.Kan.1977]. The marks "must be compared in the light of what occurs in the marketplace, not in the courtroom." *James Burrough Ltd.*, 540 F.2d at 275. "A prospective purchaser does not ordinarily carry a sample or specimen of the article he knows well enough to call by its trade name, he necessarily depends upon the mental picture of that which symbolizes origin and ownership of the thing desired." *Avrick v. Rockmont Envelope Co.*, 155 F.2d 568, 573 (10th Cir.1946). Therefore, the court must determine whether the alleged infringing mark will be confusing to the public when singly presented. *Id.* at 572–73; *American Home Products*, 589 F.2d at 107; *James Burrough Ltd.*, 540 F.2d at 275; *Union Carbide [Corp. v. Ever-Ready, Inc.]*, 531 F.2d [366] at 382 [ (7th Cir.), *cert. denied*, 429 U.S. 830 [97 S.Ct. 91, 50 L.Ed.2d 94] (1976) ].

711 F.2d at 941.

Jordache's survey relied upon a "side-by-side" comparison. After the survey participants were asked several preliminary questions, they were handed a pair of Lardashe jeans and a pair of Jordache jeans and told to examine them. The participants were then asked if they thought the jeans were produced by the same manufacturer. This type of "side-by-side" comparison bears little resemblance to the actual workings of the marketplace.[5] The district court did not err in giving little weight to the survey results.

**5.** Other surveys have easily avoided "side-by-side" comparisons by simply showing a consumer the product bearing the allegedly confusing mark and asking who manufactures the product and what other products are sold by that manufacturer. *See Union Carbide*, 531 F.2d at 385–86; *see also Standard Oil Co.*, 252 F.2d at 74–75 n. 31 (in a suit brought against Standard Oil of Ohio for the use of a "SOHIO" mark, a survey conducted in Michigan asked, " 'If you were to stop at a service station in Michigan displaying the name SOHIO as shown here, what oil company would you think put out the gas and oil sold there?' ").

### E.

Appellant argues that the allegedly inferior quality of Lardashe jeans compared to Jordache jeans supports a finding of likelihood of confusion, and that the district court erred in not considering the quality of the jeans. If there is a difference in quality between the jeans, the public is less likely to be confused. A showing that products are of dissimilar quality affords no support for a finding of a likelihood of confusion.[6]

### F.

The district court weighed all of the factors and concluded there is no likelihood of confusion between the Lardashe mark and the Jordache marks. We have examined the record, including the testimony of Becky Ingram concerning industry confusion and all of the other evidence appellant contends the district court overlooked. We hold the district court's finding of no likelihood of confusion is not clearly erroneous.

### II.

Jordache also raises a claim under New Mexico's antidilution statute which provides:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a trademark or trade name ... is a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.M.Stat.Ann. § 57–3–10 (1987). No state court in New Mexico has interpreted this

**6.** The Second Circuit has included "the quality of defendant's product" in its list of factors to be considered in a trademark infringement case. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). It appears that this factor is particularly relevant in determining whether an unlawful infringement should be enjoined. *See Lambda Elecs. v. Lambda Technology, Inc.*, 515 F.Supp. 915, 929 (S.D.N.Y. 1981). We fail to see, however, why products of dissimilar quality are more likely to be confused.

statute. We are thus presented with a question of law regarding what interpretation the New Mexico courts would adopt for this statute.

It has been widely observed that many courts have been hostile to state antidilution statutes. *See* 2 J. McCarthy *Trademarks and Unfair Competition* § 24:13(B) at 215–18 (2d ed. 1984 & Supp. 1986); 1 J. Gilson, *Trademark Protection and Practice* § 5.05(9) at 5–40 to –46 (1987 ed.); Denicola, *Trademarks as Speech: Constitutional Implications of the Emerging Rationales for the Protection of Trade Symbols*, 1982 Wis.L.Rev. 158, 183–84 (1982) [hereinafter *Trademarks as Speech* ]. The decisions holding that antidilution statutes do not apply to competitive products are an indication of this hostility. *See, e.g., EZ Loader Boat Trailers, Inc. v. Cox Trailers, Inc.,* 746 F.2d 375, 380–81 (7th Cir.1984) (citing *Filter Dynamics Int'l, Inc. v. Astron Battery, Inc.,* 19 Ill. App.3d 299, 314–15, 311 N.E.2d 386, 398–99 (1974)); *Smithkline Beckman Corp. v. Proctor & Gamble Co.,* 591 F.Supp. 1229, 1246–47 (N.D.N.Y.1984), *aff'd,* 755 F.2d 914 (2d Cir.1985). As the district court noted, "The paradigmatic dilution case involves the situation where the same or very similar marks are being used on vastly different products. Examples might include BEEFEATER used for a restaurant; DIOR used for a cleaning establishment; BACARDI used for jewelry; PLAYBOY used for auto repair." 625 F.Supp. at 56 (citation omitted). Indeed, the first exposition of the dilution doctrine stated the real injury in dilution cases "is the gradual whittling away or dispersion of the identity and hold upon the public mind of the mark or name by its use upon *non-competing* goods." Schechter, *The Rational Basis of Trademark Protection,* 40 Harv.L.Rev. 813, 825 (1927) (emphasis added).

■ The district court in this case recognized that other courts have limited antidilution statutes to cases involving noncompeting products, but the district court did not so limit the New Mexico statute. Given the plain language of the statute that relief is available "notwithstanding the absence of competition between the parties," we agree the statute cannot be limited to cases involving noncompeting products. "Had the [legislature] intended to make the absence of competition a prerequisite to ... relief, it could easily have done so." *Lesportsac, Inc. v. K Mart Corp.,* 617 F.Supp. 316, 319 (E.D.N.Y.1985). We will not ignore the clear words of the New Mexico legislature.

There are three grounds under which an owner of a distinctive trademark may obtain relief under an antidilution statute. Relief may be granted if:

[T]here is a likelihood of dilution due to (1) injury to the value of the mark caused by actual or potential confusion, (2) diminution in the uniqueness and individuality of the mark, or (3) injury resulting from use of the mark in a manner that tarnishes or appropriates the goodwill and reputation associated with plaintiff's mark.

*L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 30 (1st Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987). Dilution, like likelihood of confusion, is a question of fact that we review under the clearly erroneous standard.

The first ground merely repeats the likelihood of confusion test for relief under the Lanham Act. We have held there is no likelihood of confusion between the Lardashe and the Jordache trademarks. Therefore, there is no dilution of Jordache's marks in this sense.

■ Dilution of a trademark can also occur if the challenged mark blurs the mental image conveyed by the original mark. The statutorily protected distinctive quality of a trademark is diluted as the mark's propensity to bring to mind a particular product or source is weakened. *Stop the Olympic Prison v. United States Olympic Comm.,* 489 F.Supp. 1112, 1123 (S.D.N.Y. 1980). As the distinctive quality disappears, the trademark becomes generic and loses its legal protection. *Cf. Beer Nuts I,* 711 F.2d at 939.

■ In the present case, the district court found that "[b]ecause of the parody

aspect of Lardashe, it is not likely that public identification of JORDACHE with the plaintiff will be eroded; indeed, parody tends to increase public identification of a plaintiff's mark with the plaintiff." 625 F.Supp. at 57. The court further found that "[u]nder all the circumstances, the continued existence of LARDASHE jeans simply will not cause JORDACHE to lose its distinctiveness as a strong trademark for jeans and other apparel." *Id.* We hold these findings are not clearly erroneous.

▉ The third element of dilution law is tarnishment.[7] A mark can be tarnished if it is used in an unwholesome context. Precisely what suffices as an unwholesome context is not immediately evident. *Compare Toho Co. v. Sears, Roebuck & Co.,* 645 F.2d 788, 793 (9th Cir.1981) (use of "Bagzilla" mark on garbage bags not "unsavory or degrading"); *Tetley, Inc. v. Topps Chewing Gum, Inc.,* 556 F.Supp. 785, 794 (E.D.N.Y. 1983) ("Petley Flea Bags" does not tarnish "Tetley Tea Bags"); *Girl Scouts of United States v. Personality Posters Mfg.,* 304 F.Supp. 1228, 1233–34 (S.D.N.Y.1969) (use of "Be Prepared" slogan on poster portraying a pregnant girl in a Girl Scout uniform does not injure the Girl Scouts), *with Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2d Cir.1979) (use of Dallas Cowboys Cheerleaders uniforms in "sexually depraved" movie improperly injures plaintiff's business reputation); *Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.,* 642 F.Supp. 1031, 1039–40 (N.D.Ga.1986) (use of "Garbage Pail Kids" on various products sufficient evidence of tarnishment to support a preliminary injunction); *Coca-Cola Co. v.*

*Gemini Rising, Inc.,* 346 F.Supp. 1183, 1189 (E.D.N.Y. 1972) (use of Coca-Cola design in "Enjoy Cocaine" poster improper tarnishment). The district court found that while LARDASHE "might be considered to be in poor taste by some consumers ... it is not likely to create in the mind of consumers a particularly unwholesome, unsavory, or degrading association with plaintiff's name and marks." 625 F.Supp. at 57. We have examined the record, including the marks in question, and we conclude that the district court's finding is not clearly erroneous.

Appellant contends that tarnishment can also occur in another manner that was not discussed by the district court. A few cases have held a trademark was tarnished by "use in a context which, while not inherently 'unwholesome', is out-of-keeping with plaintiff's high-quality image." 2 J. McCarthy, *Trademark and Unfair Competition Law* § 24:13(E) at 222 and cases cited therein (2d ed. 1984). *See also* 1 J. Gilson, *Trademark Protection and Practice* § 5.05(2)(a) at 5–29 to –31 (1987). According to appellant, these cases require a finding of tarnishment here because of the alleged disparity in quality between Lardashe jeans and Jordache jeans.

▉ This argument presumes that the public will associate the manufacturer of Lardashe jeans with the manufacturer of Jordache jeans, thereby causing damage to the high quality image of Jordache. Because we find that the Lardashe mark was an intentional parody of the Jordache mark, we assume that the public will to some extent associate the two marks. To be actionable, however, the association of

---

7. A growing number of judges and commentators have sought to extend first amendment protection to the noncommercial use of trademarks. *See, e.g., San Francisco Arts & Athletics, Inc.,* 107 S.Ct. at 2993–3000 (Brennan, J., dissenting); *L.L. Bean,* 811 F.2d at 28–34; *International Olympic Comm. v. San Francisco Arts & Athletics,* 789 F.2d 1319, 1320–26 (1986) (Kozinski, J., dissenting from denial of rehearing en banc), *aff'd sub nom. San Francisco Arts & Athletics,* — U.S. —, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987); Note, *Trademark Parody,* 72 Va.L. Rev. at 1107–17; Dorsen, *Satiric Appropriation and the Law of Libel, Trademark, and Copyright:*

*Remedies Without Wrongs,* 65 B.U.L.Rev. 923, 949–52 (1985); Denicola, *Trademarks as Speech,* 1982 Wis.L.Rev. at 190–206; *but see, e.g., Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206 (2d Cir.1979). The tension between the first amendment and trademark rights is most acute when a noncommercial parody is alleged to have caused tarnishment, a situation in which first amendment protection is greatest. This concern is not as great here because Lardashe is being used as a trademark to identify a commercial product. *See L.L. Bean,* 811 F.2d at 32; Note, *Trademark Parody,* 72 Va.L.Rev. at 1081 n. 10.

the two marks must tarnish or appropriate the good will and reputation of the owner of the mark. If the public associates the two marks for parody purposes only and does not associate the two sources of the products, appellant suffers no actionable injury. Indeed, a manufacturer of a high quality product will typically benefit if its competitors are marketing a poor quality product at similar prices—*unless* the public associates the manufacturer of the poor quality product with the manufacturer of the high quality product. *See id.* at 5–31 ("A trademark owner should not be made to tolerate an unknown quality level for products, whether similar or not, *if they would likely be associated with his business.*") (emphasis added). Thus, the actionable association of marks is limited to an association of the source of the marks. Association of marks for parody purposes without corresponding association of manufacturers does not tarnish or appropriate the good will of the manufacturer of the high quality similar product.

The New Mexico statute plainly states that an actionable dilution of a trademark can occur despite the absence of competition between the parties and despite the absence of confusion as to the source of the products. But the statute also provides that relief is available only if there is some likelihood of injury to business reputation or of dilution of the distinctive quality of the trademark. There can be no likelihood of either injury if the public does not associate a product bearing one trademark with the manufacturer of a product bearing a different trademark.

The cases finding a trademark had been tarnished even though there was no unwholesome context all involve the use of identical, or almost identical, trade names on different products. *See Steinway & Sons v. Robert Demars & Friends,* 210 U.S.P.Q. 954 (C.D.Cal.1981) (Steinway pianos and Stein-Way clip-on beverage can handles); *Cartier, Inc. v. Three Sheaves Co.,* *Inc.,* 465 F.Supp. 123 (S.D.N.Y.1979) (Cartier jewelry, china, and silver and Cattier cosmetics and toiletries); *Carling Brewing Co. v. Philip Morris Inc.,* 297 F.Supp. 1330 (N.D.Ga.1968) (Black Label beer and Black Label cigarettes); *Tiffany & Co. v. Boston Club, Inc.,* 231 F.Supp. 836 (D.Mass.1964) (Tiffany jewelry, china, silverware, and glassware and Tiffany's Restaurant and Lounge); *see also Yale Elec. Corp. v. Robertson,* 26 F.2d 972, 974 (2d Cir.1928) (Hand, L., J.) (Yale locks and Yale flashlights). In each of these cases the public could readily associate one product with the manufacturer of the other product on the assumption that the manufacturer is in the business of producing two separate and distinct products. This is not the case here. It is unlikely that the public would assume that the same manufacturer would use quite different marks on substantially the same product. While we do not hold that this type of tarnishment is established only where the Lanham Act likelihood of confusion test has been satisfied, the anti-dilution statute does require some showing that the public will associate both products with the same manufacturer. Our review of the record convinces us that the public will not associate Lardashe jeans with the appellant or, if they do, they will only make the association because of the parody and not because they believe Jordache Enterprises, Inc. manufactures Lardashe jeans. Therefore, there is no likelihood of an injury to appellant, and its dilution claim must fail.

### III.

" 'If it had grown up,' she said to herself, 'it would have been a dreadfully ugly child; but it makes rather a handsome pig, I think.' " L. Carroll, *Alice's Adventures in Wonderland* 78–79 (1892).

The judgment of the district court is affirmed.