**JORDACHE ENTERPRISES, INC., Plaintiff,**

v.

**HOGG WYLD, LTD., Susan Duran, Marsha Stafford, and Oink, Inc., Defendants.**

**Civ. No. 84–1616 HB.**

United States District Court, D. New Mexico.

Aug. 1, 1985.

Earl R. Norris, Oldaker & Oldaker, Albuquerque, N.M., and Steven M. Gerber, New York City, for plaintiff.

Jay Hertz, Sutin, Thayer & Browne and Stephen E. Woodbury, Albuquerque, N.M., for Hogg Wyld, Ltd., Susan Duran, Marsha Stafford and Oink, Inc.

## MEMORANDUM OPINION

BRATTON, Chief Judge.

This cause comes on for decision on the merits. The suit involves claims of trademark infringement under 15 U.S.C. §§ 1051, 1114 and 1125 (the Lanham Act), common law trademark infringement, and violation of the New Mexico Trademark Act, N.M.Stat.Ann. §§ 57–3–1 *et seq.* (1978), specifically § 57–3–10, the New Mexico "anti-dilution" statute. Defendants have counterclaimed requesting a declaratory judgment that their use of the "Lardashe pig pocket" mark in connection with the sale of jeans does not infringe upon any rights of the plaintiff. A non-jury trial was held June 20, 21, and 22, 1985. In addition, a hearing was held November 2, 1984 on plaintiff's application for a preliminary injunction. The Court has considered evidence introduced at that hearing as well as at trial in reaching its decision on the merits. Having considered the evidence, the arguments and authorities advanced by the parties, and the record, the Court finds in favor of the defendants and against the plaintiff on plaintiff's claims, and on defendants' counterclaim. This Memorandum Opinion shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

■ The plaintiff, Jordache Enterprises, Inc. (Jordache), is a New York corporation which manufactures, markets, and licenses the manufacture and marketing of various items of apparel. Its principal line of apparel is designer blue jeans; that is, jeans intended to be stylish, fashionable, social and sport wear, rather than primarily work-wear. Jordache also markets or licenses the marketing of a number of other Jordache clothing items, accessories, and personal care items. Jordache is the owner of several trademarks used on, and in connection with the sale of, its jeans and other products. It has duly registered at least three of its marks with the U.S. Patent and Trademark Office. In 1979, it obtained a registration of the mark JORDACHE, in block letters, for use in connection with jeans and items of apparel. In 1983, it obtained registration of a mark consisting of JORDACHE printed in block letters superimposed over a drawing of a horse's head. At the same time, it obtained registration of a mark consisting simply of the horse's head drawing alone. In addition, an exhibit was introduced which indicates that plaintiff also employs a mark on some of its products consisting of the name Jordache in script lettering. There is no evidence that this mark has been registered.

Testimony at trial established that the plaintiff company was formed in 1978 with the intent of marketing stylish, fashionable jeans. It was formed by Joe Nakash and his two brothers, Israeli immigrants, who had arrived in the United States a few years earlier virtually penniless. The JOR-

DACHE mark was used on and in connection with plaintiff's products from the beginning of the enterprise. The horse's head mark was also used from the beginning or was adopted within a short time thereafter. One or more of its trademarks appears on all of the products manufactured or licensed by Jordache.

Through a massive initial advertising campaign Jordache created a very large customer awareness and demand for its products. It has continued to expend very large sums on advertising. Evidence was submitted which indicates that Jordache spent some $30,000,000 to advertise its products in 1984. Its advertising is done on television, radio, newspapers, magazines, trade publications, in-store promotions, contests, give-aways, etc. Jordache products are sold in a wide range of retail outlets throughout the United States and internationally. Evidence indicates that Jordache has become the country's fourth largest jeans manufacturer, selling over 20,000,000 pairs of jeans annually, with gross sales in the amount of some $500,000,000 in 1984.

The evidence establishes beyond any doubt that JORDACHE is a very strong trademark, and that it has acquired secondary meaning; that is, the mark is widely associated with the plaintiff company in the mind of consumers. *See, Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934 (10th Cir.1983). While there was little specific evidence as to the strength of the horse head mark, the Court finds from all the circumstances that it is also a strong mark.

One of Jordache's licensees is Shaker Sport, which manufactures and markets Jordache large size jeans, clothing items, and accessories. These products are designed for large size women, and are marketed and advertised to appeal to that segment of the market. Evidence established that Shaker Sport has spent large sums of money annually advertising its line of Jordache large size jeans. Jordache large size jeans are sold in a wide range of retail outlets throughout the United States. The Jordache trademarks are used by Shaker Sport in advertising and marketing its line of Jordache large size jeans, and one or more of the marks appears on every Jordache item marketed by Shaker Sport. Apparently Jordache Enterprises itself does not produce a product designed especially for large size women. Evidence indicated that a primary emphasis of Shaker Sport's advertising has been, "Now, you (large size women) can also achieve the Jordache 'look'."

The evidence indicates that Shaker Sport's line of Jordache large size clothing has been a success. It has sold in the range of 33,000 to 60,000 pairs of Jordache large size jeans to date. Jordache has retained the right to approve and closely monitor all aspects of the manufacture, advertising, and marketing of Jordache products sold by its licensees, including Shaker Sport. For purposes of this law suit, the question whether defendants have infringed upon Jordache's trademarks relates to the use of those marks by both Jordache and by its licensee, Shaker Sport. The same strong Jordache trademarks appear on, and are used in connection with, products sold by Shaker Sport under license from Jordache. It is the exclusive right to control the use of Jordache marks on items of apparel, primarily on large size designer jeans, that plaintiff seeks to protect from infringement in this suit.

Defendant Oink, Inc., formerly Hogg Wyld, Ltd., is a New Mexico corporation founded in 1984 by the defendants Marsha Stafford and Susan Duran. (The defendants may be referred to collectively as Lardashe.) Its primary business is marketing designer jeans for large size women under the trade name Lardashe, employing the "LARDASHE pig pocket" as a trademark. This mark consists of the name LARDASHE in script lettering stitched into the right rear pocket of the jeans; an inverted-heart-shaped embroidered design also on the pocket; and an embroidered applique of a pig's head and pig's feet, sewn onto the garment to appear as if the pig is peering over the top of the pocket.

Duran and Stafford began to market their Lardashe jeans in August or September of 1984. At that time they were operating as an informal partnership. They have been friends for a number of years, and at some point conceived the idea of designing and selling designer jeans for large size women. Both women testified that they themselves wear larger size clothing. They perceived that larger size women like themselves were unable to wear designer jeans, which apparently were available originally only in "standard" sizes for women. They felt that there existed a market for women's large size designer jeans which, to their knowledge, no manufacturer was exploiting at that time. They set about to produce a garment to fill that void. They testified that their design includes a number of features not found in "standard" size designer jeans, which they included specifically to make the garment comfortable to and attractive on larger size women.

Duran and Stafford found a manufacturer for their product, had him make a prototype of the garment, and ultimately had him manufacture an initial order of some 500 pairs of jeans in various sizes, incorporating their design features. They had arranged for a separate company to produce the pig applique, which Stafford herself sewed onto each pair of jeans. The women have financed this enterprise using personal savings, loans from acquaintances, and after the initial order was received, from the sale of jeans. They have operated the business out of their homes.

While their record-keeping has been somewhat loose, it appears that approximately 1600 pairs of Lardashe jeans have been produced, and approximately 1300 pairs have been sold. To date, sales have been limited to several specialty shops and boutiques in New Mexico, Colorado, and Arizona in relatively small quantities. In addition, Duran and Stafford have sold a number of pairs of Lardashe jeans to individuals, either acquaintances or women who learned of the product and asked to buy a pair. They state that they have never formally advertised. Several newspaper ads have been placed by shops carrying Lardashe jeans.

Despite the great difference in size of the two companies, and the so far limited retail availability of Lardashe jeans, the two products are presently in actual competition. At least one of the shops that carries Lardashe jeans also carries, or has carried, Jordache jeans. In addition, Lardashe hopes to expand its market, ultimately to sell its jeans in a wide range of retail outlets nationwide, should customer awareness and demand justify such expansion. Shortly after Lardashe began to sell its jeans, in the fall of 1984, a New Mexico television station ran a brief news item about Lardashe jeans, featuring Duran and Stafford. This news spot subsequently was broadcast by a national television network. It was because of this national news item that officials at Jordache became aware of the existence of Lardashe. The ensuing publicity generated several inquiries to Duran and Stafford from garment marketers around the country concerning the possibility of carrying Lardashe jeans. One of the inquiries was from J.C. Penney Co., certainly one of the largest retailers in the country. Evidence indicated that J.C. Penney also carries Jordache products. There is a strong possibility that actual competition between Jordache and Lardashe will increase.

A question of fact exists as to defendants' intent in selecting the name Lardashe for their product. Why and how were the name, and the Lardashe pig pocket mark, selected? Plaintiff points to the similarities in spelling and pronunciation of the two trade names, and defendants' use of an animal's head in conjunction with the name. It contends that these factors compel the conclusion that defendants intended to imitate the Jordache trademarks, to cause confusion between the two marks in the minds of consumers. Defendants claim that similarities to the Jordache name and marks were never considered in selecting the name Lardashe and the pig pocket mark.

At both the preliminary injunction hearing and at trial, Stafford and Duran testified that the name Lardashe was simply a more polite form of the word "lardass." "Lardass" had been Stafford's nickname since childhood. She testified that she had considered the idea of making jeans with this more polite form of her nickname for a number of years. Both women testified that they were only vaguely familiar with the Jordache name and brand of jeans at the time they decided to start their business. They contend that the similarities between the two marks never occurred to them at that time, nor do they perceive that the marks are closely similar now. Stafford testified that the letter "e" at the end of Lardashe is intended to give the name more style, and also to represent a pig's tail as it appears in script lettering. Stafford also testified that "ashe" is a play upon the names of ancient goddesses Asherah and Ashtoreth, who are mentioned in the Bible.

Duran testified at the preliminary injunction hearing, however, that the women had considered such names as "Calvin Swine," "Sow-soon," and "Horse's ashe" as possible names for their jeans. At trial, it was explained that those names were merely discussed in fun, well after they had decided upon the name Lardashe. In essence, they maintain that Lardashe was selected solely as a play upon Stafford's nickname, and it was never intended nor contemplated to be similar to or to play upon the name Jordache.

The Court finds that defendants' explanation for the selection of the name Lardashe is not credible. Considering all the circumstances, the Court finds that the defendants intended the name Lardashe to be a humorous play upon the name Jordache. The Court finds further, however, that the defendants did not intend the name Lardashe to be confusingly similar to Jordache, so as to cause confusion between the two names in the public mind. Defendants' intent was to employ a name that, to some extent, parodied or played upon the established trademark Jordache. Defendants did not intend to "palm off" their jeans as Jordache jeans; that is, to confuse the public into believing it was buying a Jordache product.

15 U.S.C. § 1051 provides for the registration of trademarks with the Patent and Trademark office. It is undisputed that Jordache has duly registered, pursuant to § 1051, several of the trademarks at issue in this suit. 15 U.S.C. § 1114 provides protection against infringement for a registered trademark. It provides, in pertinent part,

> (1) Any person who shall, without the consent of the registrant (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale ... or advertising of any goods ... which such use is likely to cause confusion, or to cause mistake, or to deceive; ... shall be liable in a civil action by the registrant ...

15 U.S.C. § 1125 provides protection for any trademark, whether registered or not, against infringement by a junior user of the mark. It provides, in pertinent part,

> Any person who shall affix ... or use in connection with any goods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of such false description or representation.

Jordache has alleged that the use by defendants of the Lardashe trademark violates §§ 1114 and 1125, as well as the common law of unfair competition. It is well settled that the test is the same for determining whether infringement has occurred under either of these statutes or under the common law of unfair competition: the so-called "likelihood of confusion test." *Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556 (10th Cir.1984). "A trademark is infringed if use of the allegedly infringing mark is likely to cause confusion or mistake, or to deceive purchasers ... as to the source,

endorsement, affiliation or sponsorship of the product." *Id.* at 559 (citing *Control Components, Inc. v. Valtek, Inc.*, 609 F.2d 763, 771 (5th Cir.1980).

In this case, the dispositive issue as to each of plaintiff's infringement counts is whether an average consumer is likely to be confused that Lardashe jeans are manufactured by or are affiliated with Jordache. In *Beer Nuts, Inc. v. Clover Club Foods, Co.*, 711 F.2d 934 (10th Cir.1983), the Court of Appeals for the Tenth Circuit thoroughly discussed the factors to be considered in determining likelihood of confusion. "The resolution of this issue requires the court to consider numerous factors to determine whether, under all the circumstances, there is a likelihood of confusion" in the marketplace. 711 F.2d at 940 (citing *Vitek, supra*). The court set forth four general factors to be examined in making the determination:

> (a) the degree of similarity between the designation and the trade-mark or trade name in
>
> (i) appearance;
>
> (ii) pronunciation of the words used;
>
> (iii) verbal translation of the pictures or designs involved;
>
> (iv) suggestion;
>
> (b) the intent of the actor in adopting the designation;
>
> (c) the relation in use and manner of marketing of the goods of the two parties;
>
> (d) the degree of care likely to be exercised by purchasers.

*Id.* The court stated that this list is not exhaustive and that no one factor is determinative. Ultimately, the facts of each case must be examined carefully to determine whether, under all the circumstances, there will be a likelihood of confusion *in the marketplace.* Side by side comparison, in the context of a court proceeding, is not the test. *Id.* at 941.

The Court finds, considering all the factors set forth above and the somewhat unique circumstances presented by this case, that there is no likelihood that consumers in the marketplace will be confused that Lardashe jeans are made by, or are affiliated with, Jordache. There is an obvious similarity in appearance and pronunciation between the names Jordache and Lardashe. There is little similarity between the Jordache "horse-head" mark and the Lardashe "pig pocket design." The "horse head" design is relatively subtle and refined. In contrast, the "pig pocket" is striking, brightly colored, and far from subtle. The pictures and designs of the two marks verbally translate quite dissimilarly. Obviously, one is a horse and the other a pig. Moreover, the two marks suggest dissimilar images or concepts. The Jordache mark can be characterized fairly as suggesting an image or concept of style or "class." Without meaning to imply that Lardashe jeans are not stylish or fashionable, the image suggested by the Lardashe mark is humorous, or "cute," or facetious.

It is true that the nature of the goods is the same; both are designer jeans. It is also true that they are likely to be marketed, advertised, and displayed in stores in a similar way. On the other hand, as to care exercised at time of purchase, the evidence established that both brands of jeans generally retail for at least $15.00 and in some cases for as much as $60.00 per pair. Moreover, it is likely that most customers will examine clothing items of this type rather carefully prior to purchasing them. A high degree of care is likely to be exercised by purchasers of these products.

Considering all these factors, the Court finds that there is not a likelihood that consumers will be confused between the two brands of jeans. There is simply no likelihood that consumers will purchase a pair of Lardashe jeans, believing that she is purchasing Jordache jeans. The two marks are so obviously distinct in their overall appearance, in the image they suggest, and in the concept each embodies, that the average consumer is unlikely to be confused between the two in the marketplace. The overall differences between the two marks greatly overcomes the similarity in spelling and pronunciation of the names Jordache and Lardashe. There is no likeli-

hood that Lardashe jeans will be "palmed off" as Jordache jeans.

There was not sufficient credible evidence to convince the Court of a likelihood that consumers will believe Lardashe is somehow affiliated with, or sponsored by, Jordache. Paul Ornstein, Executive Vice President of Shaker Sport, testified that he was contacted by colleagues in the garment industry who evidenced actual confusion regarding an affiliation between Lardashe and Shaker Sport's Jordache large size jeans. This testimony was hearsay. Even if it had constituted admissible evidence, it would not have constituted evidence of actual confusion by consumers in the marketplace, but rather confusion by industry professionals. Likelihood of confusion on the part of such industry professionals does not establish trademark infringement. *Cf., Beer Nuts, supra.*

Plaintiff also introduced evidence in the form of a consumer survey. The survey was devised by, and conducted under the direction of, Dr. Avraham Shama, a professor of marketing, who also testified. Seventy persons were surveyed. They were asked several questions concerning their ownership of jeans and general knowledge of brands of jeans. They were then asked to examine pairs of Jordache and Lardashe jeans, and were asked to give their impressions concerning manufacture, affiliation, and quality of the two brands. The survey was conducted in the Student Union building of the University of New Mexico. The respondents were primarily students. Approximately half were male and half were female. All said they were jeans wearers.

In pertinent part, the survey results were as follows. Thirteen of the respondents thought Lardashe and Jordache "jeans" were similar. This figure is essentially irrelevant, as it is the similarity of the marks, not of the products, that is at issue. In this case, whether a consumer may perceive the products themselves as similar is little help in determining whether there is a likelihood of confusion as to source of origin of the products. Ten respondents answered that they felt Jordache and Lardashe jeans were manufactured by the same manufacturer. Fifty-eight stated that they felt the jeans were manufactured by different manufacturers, and two had no opinion. This does not constitute compelling evidence of a *likelihood* of confusion in the marketplace. Indeed, this survey was not conducted in the marketplace among potential jeans purchasers. Most important, however, this figure is evidence merely of the possibility of confusion, not its likelihood. A showing of a possibility of confusion is not sufficient to prove infringement. *E.g., Instrumentalist Co. v. Marine Corps League*, 509 F.Supp. 323 (N.D.Ill.1981). Likelihood of confusion is the test.

The survey went on to ask those who believed the jeans were made by different manufacturers whether the two names were confusing. A total of 63 respondents answered this question, ten in the affirmative and 53 in the negative. Yet, only 58 respondents properly should have answered this question, as 58 had answered "different manufacturers" to the prior question. The results of the question are therefore inconclusive. Moreover, this figure does not constitute compelling evidence of likelihood of confusion.

In *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655 (2d Cir.1979), the court found permissible the district court's rejection of a far more extensive and compelling consumer survey. The survey was rejected in part because it was not conducted under actual marketing conditions. In the case at bar, the Court finds plaintiff's survey evidence insufficient to prove likelihood of confusion among consumers in the marketplace. Its results are equivocal at best, and the setting, limited size of the sample, and methodological and computational weaknesses, render it uncompelling. Under all the circumstances, plaintiff has failed to prove by a preponderance of the evidence a likelihood of confusion as to manufacture, sponsorship or affiliation.

■ There is an additional aspect to the Lardashe name and mark which compels the conclusion that its use does not infringe upon the Jordache name and marks: the aspect of parody. Parody is not an affirmative defense in a trademark infringement case, as plaintiff contends. It is "merely a way of phrasing the traditional response that customers are not likely to be confused as to source, sponsorship or approval." 2 J.T. McCarthy, Trademarks and Unfair Competition § 31.38 (2d ed. 1984).

> [I]nnocent and clean parodies of famous marks cause no loss of distinctiveness because success of the joke depends upon continued association of the mark with its owner: "[T]he joke itself reinforces the public's association of the mark with the plaintiff." [citation omitted] What must be kept in mind in such cases is that "confusion" means more than that the junior user's mark merely "calls to mind" the senior user's mark. [citations omitted] That the defendant's joke mark calls the plaintiff's mark to mind is necessary for there to be a humorous parody at all.... But the requirement of trademark law is that a likely confusion of source, sponsorship or affiliation must be proven, which is not the same thing as a "right" not to be made fun of.

*Id. Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112 (2d Cir.1984), was an infringement suit brought by the owner of the trademark rights to the movie character "King Kong," against the manufacturer of the video game "Donkey Kong." The trial court had found that Donkey Kong creates a different concept and feel from the drama of King Kong, and that Donkey Kong was a parody of King Kong. The court of appeals stated, "[T]he fact that Donkey Kong so obviously parodies the King Kong theme strongly contributes to dispelling confusion on the part of consumers." *Id.* at 116.

In the case at bar, the Lardashe name and mark are to some degree an obvious parody of the Jordache name and marks. This fact, and the fact that the marks create a very different concept, image, and "feel," contributes to dispelling confusion as to source, affiliation, or sponsorship on the part of consumers.

A somewhat related issue concerns whether trademark infringement exists where a junior user of a mark intentionally undertakes to capitalize upon public awareness of a product or an idea created by the advertising of the senior user. The few cases that have discussed this specific issue have held that such action alone does not constitute infringement or unfair competition. In *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 662 (2d Cir.1979), the court stated, "[O]ne can capitalize on a market or fad created by another provided that it is not accomplished by confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competitor." The court went on to state, "[J]ust as the expenditure of large sums of money does not in and of itself create legally protectable rights, so, too, the mere presence of extensive advertising does not assure the existence of a likelihood of confusion." *Id.* at 663. The court held that while the defendant plainly intended to capitalize upon plaintiff's popularization of the term "Bionic" when it used it as a mark for shoes, it did not so capitalize by confusing customers. Therefore, there was no infringement. In *Warner Bros., Inc. v. Gay Toys, Inc.*, 513 F.Supp. 1066 (S.D.N.Y. 1981), defendant manufactured a toy car that was nearly an exact replica of a car featured prominently in a popular television series. The court found that defendant intentionally designed its product to capitalize on the popularity of plaintiff's mark, the car. The court found no likelihood of confusion as to source or affiliation. It held that absent confusion it is not improper for a competitor to benefit from the incidental fallout of plaintiff's advertising and promotion. *See also, Haagen-Dazs, Inc., v. Frusen Gladje Ltd.*, 493 F.Supp. 73 (S.D.N.Y.1980) (Plaintiff does not have exclusive right to "unique marketing theme," which it created and advertised

heavily, absent likelihood of confusion as to source or affiliation).

■ Lardashe may intentionally have set out to capitalize upon, through parody, the fact that Jordache is a well recognized name and mark among consumers. There is no question that Jordache has advertised extensively in order to create that customer recognition. However, such an intent by Lardashe, without the existence of a likelihood of confusion between the marks, does not infringe any rights possessed by Jordache. It does not own in gross the penumbral customer awareness of its name, nor the fallout from its advertising.

■ Plaintiff has also brought a cause of action under the New Mexico Trademark Act, N.M.Stat.Ann. §§ 57–3–1, *et seq.* The Act includes a statute prohibiting trademark infringement, N.M.Stat.Ann. § 57–3–9 (1978). That section applies both to state-registered marks, which has not been shown to exist in this case, as well as to any other mark used upon goods in the state. The language of § 57–3–9 is similar to 15 U.S.C. § 1125. No New Mexico case has indicated that the test for infringement under § 57–3–9 should be any different from the "likelihood of confusion" test for infringement at federal and common law, and plaintiff has not argued that the standards are different. The tests being the same, plaintiff has not proved that defendants actions violate § 57–3–9.

N.M.Stat.Ann. § 57–3–10 states:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a trademark or trade name ... valid at common law is ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

This is a so-called anti-dilution statute. No New Mexico court appears to have construed the statute. However, the statute is essentially identical to anti-dilution statutes in many other states. *See, e.g.,* N.Y.Gen. Bus.Law § 368–d; Ill.S.H.A. ch. 140, § 22.

"The dilution theory grants protection to strong, well-recognized marks even in the absence of likelihood of confusion, if defendant's use is such as to tarnish, degrade, or dilute the distinctive quality of the mark." 2 J.T. McCarthy, Trademarks and Unfair Competition § 24:13 (2d ed. 1984). Some courts have held that a cause of action for dilution does not lie where there is direct competition, the products are similar, and the question is whether the marks are confusingly similar. *See id.,* (citing cases). In such cases, it is felt that the traditional cause of action for infringement provides an adequate remedy and the proper test for determining whether there has been unfair competition. The paradigmatic dilution case involves the situation where the same or very similar marks are being used on vastly different products. *See id.,* p. 215, n. 12. Examples might include BEEFEATER used for a restaurant; DIOR used for a cleaning establishment; BACARDI used for jewelry; PLAYBOY used for auto repair. The case at bar is not a paradigmatic dilution case. Nevertheless, plaintiff's cause of action for dilution has been considered. Plaintiff has not proved that use of the Lardashe name and mark violates the New Mexico anti-dilution statute.

Courts and commentators uniformly have stated that dilution essentially can take one of two forms. *See,* McCarthy, *supra* § 24:13; 1 J. Gilson, Trademark Protection and Practice § 5.05[9] (1985); *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621 (2d Cir.1983); *Instrumentalist Co. v. Marine Corps League,* 509 F.Supp. 323 (N.D.Ill.1981). The first is the "blurring" or "whittling down" of the distinctiveness of a mark. This can occur where the public sees the mark used widely on all kinds of products. The examples set forth above exemplify potential situations where this type of dilution could occur; i.e. DIOR cleaners, BACARDI jewelry, ROLLS ROYCE cat food. The injury consists of "the risk of an erosion of the public's identification of this very strong mark with the plaintiff alone, thus diminishing its distinctiveness, uniqueness, effectiveness and

prestigious connotations." *Tiffany & Co. v. Boston Club, Inc.*, 231 F.Supp. 836 (D.Mass.1964) (use of TIFFANY for a restaurant).

Plaintiff has not proved that use of the Lardashe name and mark by defendants will whittle away or blur the distinctiveness of its name and marks. Jordache is no doubt a very strong mark, and may be entitled to protection from this type of dilution. However, such dilution is not likely to occur here. The two names and the marks are not the same or very similar. Because of the parody aspect of Lardashe, it is not likely that public identification of JORDACHE with the plaintiff will be eroded; indeed, parody tends to increase public identification of a plaintiff's mark with the plaintiff. Because of the relative lack of similarity, the uniqueness of Jordache is not likely to be eroded. Under all the circumstances, the continued existence of LARDASHE jeans simply will not cause JORDACHE to lose its distinctiveness as a strong trademark for jeans and other apparel.

The second type of dilution is tarnishment. Tarnishment of a trademark can occur, even absent confusion as to source or affiliation, where the defendant has used the same or a similar mark in a way that creates an undesirable, unwholesome, or unsavory mental association with the plaintiff's mark. Tarnishment was found in such cases as *Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir.1979) (use of the distinctive Dallas Cowboy Cheerleader uniform in a particularly obscene movie); *Coca-Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp. 1183 (E.D.N.Y.1972) (use of distinctive Coca-Cola logo to convey the message "Enjoy Cocaine" rather than "Enjoy Coca-Cola"); *General Electric Co. v. Alumpa Coal, Co.*, 205 U.S.P.Q. 1036 (D.Mass.1979) ("Genital Electric" placed within distinctive General Electric logo).

For tarnishment to exist, there must be a "particularly unwholesome association." Gilson, *supra* at § 5.05[2]. Where the association is essentially a harmless, clean

pun, which merely parodies or pokes fun at the plaintiff's mark, tarnishment is not likely. *See, Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788 (9th Cir.1981). In *Toho*, Sears had used the mark BAGZILLA and the phrase "monstrously strong" on garbage bags. The court found that this parody of plaintiff's mark GODZILLA, a movie monster character, did not constitute tarnishment. *See also, e.g., Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831 (6th Cir.1983) (no tarnishment where defendant used mark HERE'S JOHNNY and slogan "World's Foremost Commodian" in connection with portable toilets); *Girl Scouts v. Personality Posters Mfg. Co.*, 304 F.Supp. 1228 (S.D.N.Y.1969) (poster of pregnant Girl Scout with the motto "Be Prepared" not tarnishment but merely "lampooning use" of the Girl Scout name, motto, and insignia).

In the case at bar, defendants' parody of the JORDACHE mark, by the turn of phrase LARDASHE, might be considered to be in poor taste by some consumers. However, it is not likely to create in the mind of consumers a particularly unwholesome, unsavory, or degrading association with plaintiff's name and marks. There is no likelihood that LARDASHE will tarnish plaintiff's name or marks.

In summary, the Court finds that plaintiff has failed to prove that defendants have infringed upon its trademarks under 15 U.S.C. §§ 1051, 1114, or 1125; the common law of unfair competition; or the New Mexico Trademark Act. Plaintiff has also failed to prove that defendants have violated the New Mexico anti-dilution statute, N.M.Stat.Ann. § 57–3–10 (1978). A judgment shall be entered in favor of the defendants on plaintiff's claims. In addition, defendants are entitled to a declaratory judgment in their favor on their counterclaim that the LARDASHE mark does not violate any of plaintiff's rights in regard to the trademarks at issue in this cause. A judgment will be entered in conformity with this Memorandum Opinion.