MUTUAL OF OMAHA INSURANCE
COMPANY, A Nebraska
Corporation, Appellee,

v.

Franklyn NOVAK, an
Individual, Appellant.

MUTUAL OF OMAHA INSURANCE
COMPANY, a Nebraska
Corporation, Appellant,

v.

Franklyn NOVAK, an
Individual, Appellee.

Nos. 87–1042, 87–1043.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 4, 1987.

Decided Dec. 30, 1987.

Rehearing and Rehearing En Banc
Denied Feb. 17, 1988.

Warren C. Schrempp, Omaha, Neb., for appellant.

Dennis L. Thomte, Omaha, Neb., for appellee.

Before HEANEY, Circuit Judge, ROSS, Senior Circuit Judge, and BOWMAN, Circuit Judge.

BOWMAN, Circuit Judge.

Mutual of Omaha Insurance Company (Mutual) brought suit against Franklyn Novak (Novak) alleging trademark infringement and trademark disparagement. The District Court found for Mutual on the infringement issue [1] and granted a permanent injunction, but rejected the disparagement claim. Novak appeals the decision concerning infringement and Mutual appeals the disparagement decision. We affirm the District Court's infringement decision and do not reach the disparagement issue.[2]

Beginning in 1952, Mutual acquired trademark registrations for marks used in connection with its insurance services and a television program it sponsors. These marks include the familiar "Indian head" logo and the designations "Mutual of Omaha" and "Mutual of Omaha's Wild Kingdom."

In 1983 Novak produced a design reminiscent of the Mutual marks. It uses the words "Mutant of Omaha" and depicts a side view of a feather-bonneted, emaciated human head. Novak initially put the design on T-shirts along with the words "Nuclear Holocaust Insurance." Novak marketed approximately 4000 of these shirts before Mutual obtained a preliminary injunction. He also had the design placed on sweatshirts, caps, buttons, and coffee mugs, which he has offered for sale at retail shops, exhibitions, and fairs. Novak also has advertised such merchandise on television and in newspapers and magazines.

After a trial on the merits of Mutual's claims, the District Court ruled that Novak had infringed Mutual's trademarks. The District Court found that Novak's use of the design created a likelihood of confusion as to Mutual's sponsorship of or affiliation with Novak's merchandise, and therefore held such use to be in violation of both federal and state law. Accordingly, the District Court permanently enjoined Novak from advertising or marketing T-shirts, coffee mugs, and other products featuring the designations "Mutant of Omaha," "Mutant Kingdom," and "Mutant of Omaha's Mutant Kingdom," or confusingly similar designations, and also permanently enjoined Novak from using as a logo a design confusingly similar to Mutual's "Indian head" logo.

■ Like most trademark cases, this case revolves around the "likelihood of confusion" issue. *See, e.g., WSM, Inc. v. Hilton,* 724 F.2d 1320 (8th Cir.1984); *Vitek Sys., Inc. v. Abbott Laboratories,* 675 F.2d 190 (8th Cir.1982); *SquirtCo v. Seven–Up Co.,* 628 F.2d 1086 (8th Cir.1980). Specifically, the ultimate issue here is whether Novak's design so resembles Mutual's marks that it is likely to cause confusion among consumers as to whether Mutual has sponsored, endorsed, or is otherwise affiliated with the design. *See Jordache Enters. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1484 (10th Cir.1987); *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 388 (5th Cir.1977). Likelihood of confusion is a question of fact. *WSM, Inc.,* 724 F.2d at 1329; *Vitek Sys.,* 675 F.2d at 192; *SquirtCo,* 628 F.2d at 1091; *Armstrong Cork Co. v. World Carpets, Inc.,* 597 F.2d 496, 501 (5th Cir.), *cert. denied,* 444 U.S. 932, 100 S.Ct. 277, 62 L.Ed.2d 190 (1979). Thus, we can set aside the District Court's finding of a likelihood of confusion only if it is clearly erroneous. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed. 2d 518 (1985); *Rogers v. Masem,* 788 F.2d

1. Mutual claimed violations of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev.Stat. § 87–302 (Reissue 1981), and the common law. The District Court considered the elements of each of these claims to be the same, with each turning on the same infringement issue. The parties raise no claim of error in this regard.

2. We do not find it necessary to reach Mutual's disparagement claim. Deciding this issue would not affect the remedy already obtained under the infringement claim. "It is a uniform course of appellate review procedure to decline to review questions not necessary to a decision by an appellate court." *Hutchinson Utils. Comm'n v. Curtiss–Wright Corp.,* 775 F.2d 231, 238 (8th Cir.1985) (quoting *Highland Supply Corp. v. Reynolds Metals Co.,* 327 F.2d 725, 729 (8th Cir.1964)).

1288, 1292 (8th Cir.1985); *WSM, Inc.*, 724 F.2d at 1329; *Vitek Sys.*, 675 F.2d at 192; *SquirtCo*, 628 F.2d at 1091; Fed.R.Civ.P. 52(a). It is possible that we would reach a conclusion different from that of the District Court if the likelihood of confusion issue were before us de novo. But our role here is limited to determining whether there is sufficient support in the record for the District Court's finding. We believe there is such support and therefore do not view the finding of a likelihood of confusion as clearly erroneous.

In resolving the likelihood of confusion issue, the District Court considered the factors that this Court enumerated in *SquirtCo*, 628 F.2d at 1091: 1) the strength of the trademark; 2) the similarity between the trademark and the defendant's mark; 3) the competitive proximity of the products on which the respective marks are placed; 4) the intent of the alleged infringer to pass off his goods as those of the trademark holder; 5) the incidents of actual confusion; and 6) the degree of care likely to be exercised by potential customers of the trademark holder.[3] We have continued to give weight to the *SquirtCo* factors in subsequent cases. *See, e.g., WSM, Inc.*, 724 F.2d at 1329; *Vitek Sys.*, 675 F.2d at 192–93.

The first factor is undisputed. The parties agree that Mutual's trademarks are strong.

■ With respect to the second factor, the District Court concluded that Novak's design is "very similar" to Mutual's marks. *Mutual of Omaha Ins. Co. v. Novak*, 648 F.Supp. 905, 909 (D.Neb.1986). We do not disagree. The letters and styles of the

phrases are virtually identical. Novak's "Indian head" logo depicts a side view of a feather-bonneted head similar to Mutual's "Indian head" logo. And use of the word "Mutant" in place of "Mutual" is, in the context of Novak's design, suggestive of Mutual.[4]

■ Regarding competitive proximity, Novak puts his design on T-shirts and coffee mugs, the same types of items on which Mutual puts its marks. Mutual sells such items to agents and company representatives, who in turn use them as gifts or incentives. While the District Court determined that there was little or no direct competition in these items between the parties, it noted that infringement still could be found. *Mutual of Omaha Ins. Co.*, 648 F.Supp. at 910. This is undoubtedly so, for confusion, not competition, is the touchstone of trademark infringement. *See SquirtCo*, 628 F.2d at 1091; *Hanson v. Triangle Publications, Inc.*, 163 F.2d 74, 78 (8th Cir.1947), *cert. denied*, 332 U.S. 855, 68 S.Ct. 387, 92 L.Ed. 424 (1948). It is error to assume that trademark law protects against use of a mark only on directly competitive products. *See Kentucky Fried Chicken*, 549 F.2d at 388 (Fifth Circuit has "repeatedly rejected" the argument that "infringement occurs only when the alleged infringer uses the mark on the same category of product with respect to which the trademark owner obtained the mark"). "The law of trademarks ... is not so ossified, nor its protective scope so niggardly." *PGA v. Bankers Life & Casualty Co.*, 514 F.2d 665, 669 (5th Cir.1975). Moreover, by putting his design on items similar to those on which Mutual puts its marks, Novak increased the likelihood of confusion.

---

**3.** These are not necessarily the only factors that might be relevant in a particular case. The ultimate inquiry always is whether, under all the circumstances, there exists a likelihood of confusion between the plaintiff's trademark and the allegedly infringing use.

**4.** The dissent plays down the similarities between Novak's design and Mutual's marks, pointing out specific features that are different and noting that "the differences ... are unmistakable." *Post* at 403. The issue, however, "is not whether the public would confuse the *marks,* but whether the viewer of an [allegedly

infringing] mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir.1976) (emphasis in original). The similarity of appearance is to be determined by looking at the total effect of the designation, rather than by comparing individual features. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 260–61 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980).

■ With regard to the fourth factor, there is no finding by the District Court that Novak intended to pass off his goods as Mutual's, and it seems clear that he did not. This cuts in Novak's favor, but it is not dispositive, for intent to pass off one's goods as another's is not essential to an infringement claim; rather, its presence or absence is only one factor to be considered along with the other factors that bear on the issue of likelihood of confusion. *SquirtCo,* 628 F.2d at 1091.

■ As to incidents of actual confusion, Mutual produced evidence of actual confusion in the form of a survey conducted by Sorenson Marketing and Management Corporation of New York. We consider this appropriate, for surveys are often used to demonstrate actual consumer confusion. *PPX Enters. v. Audiofidelity Enters.,* 818 F.2d 266, 271 (2d Cir.1987). Sorenson interviewed at random four hundred people over the age of twenty-one in New York, Denver, Chicago, and San Francisco. While viewing Novak's design on a T-shirt, approximately forty-two percent of those surveyed said that Mutual of Omaha came to mind. Plaintiff's Exhibit No. 49, pp. 15, 33. Of that group, twenty-five percent said

that they believe Mutual "goes along" with the T-shirts "in order to help make people aware of the nuclear war problem." *See id.* at 16. Thus, approximately ten percent of all the persons surveyed thought that Mutual "goes along" with Novak's product. *Id.* at 16, 33. Because manifestations of actual confusion serve as strong evidence of a likelihood of confusion, *SquirtCo,* 628 F.2d at 1091; *World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 489 (5th Cir.1971), and may, in fact, be the best such evidence, *Jordache Enters.,* 828 F.2d at 1487, this survey should be given substantial weight unless seriously flawed. *See McDonald's Corp. v. McBagel's, Inc.,* 649 F.Supp. 1268, 1277–78 (S.D. N.Y.1986).

The District Court acknowledged that there may be some ambiguity in the "goes along" question used in the survey, but found the survey as a whole "credible evidence of a likelihood of confusion as to source or sponsorship." *Mutual of Omaha Ins. Co.,* 648 F.Supp. at 911. Novak presents no persuasive reason for overriding the District Court's evaluation of the reliability of the survey.[5] Hence, we can-

---

5. The dissent also attacks the survey's validity, but we remain unpersuaded that we should overrule the District Court's assessment of the weight to be given the survey. The dissent's primary attack focuses on the following survey question: "Would you say that Mutual of Omaha goes along or does not go along with these T-shirts in order to make people aware of the nuclear war problem?" *See post* at 403–04. The dissent finds the question "fundamentally flawed" because it "plants the idea of nuclear war in the mind of the interviewee." *Id.* at 404. When during the survey this question is presented, however, the interviewee is already viewing a T-shirt bearing Novak's design along with the phrase "Nuclear Holocaust Insurance." Thus, before the question that the dissent finds troublesome is asked, the words "Nuclear Holocaust" have already led the interviewee to consider nuclear catastrophes. The survey question simply causes the interviewee to focus on one specific kind of nuclear disaster. In our opinion, this reference to nuclear war does not make the survey fatally defective.

The dissent also objects to the survey sample. The dissent complains that the survey respondents were not asked whether they were interested in buying a T-shirt or insurance, *id.* at 404, were not from areas reached, or likely to be reached, by Novak's message, *id.* at 404, and

were not interviewed at places where insurance or T-shirts were "featured." *Id.* at 404. The dissent also criticizes the survey sample size as "miniscule." *Id.* at 404. We do not find the dissent's objections compelling and note that other courts have upheld the validity of surveys against similar attacks. In *SquirtCo,* for example, a survey was upheld as valid despite criticism that the survey failed to consider whether the interviewees had any interest in buying the kinds of products put out by the litigants and despite its having been conducted in a city where products of one of the litigants were not available or advertised. *SquirtCo,* 628 F.2d at 1089–90 n. 4. *See also McDonald's,* 649 F.Supp. at 1277–78 (court upholds validity of survey even though many interviewees had never heard of alleged infringer's products or services and were not near places where such products or services were featured). *But see Exxon Corp. v. Texas Motor Exchange of Houston, Inc.,* 628 F.2d 500, 507 (5th Cir.1980) (survey "universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer[']s goods or services") (quoting *Amstar,* 615 F.2d at 264). With regard to the survey sample size, without some basis for thinking otherwise, we decline to accept the dissent's assertion that four hundred interviewees is too few. *See Exxon,*

not say that the District Court erred in giving the survey significant weight. Courts frequently give substantial weight to properly conducted surveys. *See Anheuser–Busch Inc. v. Stroh Brewery Co.,* 750 F.2d 631, 639 (8th Cir.1984); *also SquirtCo,* 628 F.2d at 1091; *Union Carbide Corp. v. Ever–Ready Inc.,* 531 F.2d 366, 380–81, 385–87 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *Humble Oil & Ref. Co. v. American Oil Co.,* 405 F.2d 803, 817 (8th Cir.), *cert. denied,* 395 U.S. 905, 89 S.Ct. 1745, 23 L.Ed.2d 218 (1969).[6]

Concerning the final *SquirtCo* factor, the District Court found that consumers are not likely to exercise the "high degree of care or thought" necessary to "distinguish Mutual from the message on [Novak's] products." *Mutual of Omaha Ins. Co.,* 648 F.Supp. at 911. We agree. Nothing in the labeling or packaging of Novak's products indicates that the message and products do not emanate from Mutual. As a result, for consumers to learn that Mutual has no connection with Novak's products requires more than just careful scrutiny of the products, and it is improbable that consumers will engage in further investigation. We believe, as did the District Court, that the degree of care likely to be exercised by consumers does not reduce the likelihood of confusion.[7]

We are satisfied that the District Court properly weighed the *SquirtCo* factors. The record contains ample support for the District Court's finding of a likelihood of confusion. We therefore cannot say that this pivotal finding is clearly erroneous.

The cases Novak relies upon to support his view that there is no likelihood of confusion here, but merely obvious parody, lack persuasiveness in relation to the situation before us. Those cases either did not involve surveys demonstrating confusion or involved surveys of doubtful validity. For example, in *Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831 (6th Cir. 1983), the plaintiffs presented no surveys demonstrating confusion, and in *Tetley, Inc. v. Topps Chewing Gum, Inc.,* 556 F.Supp. 785, 793 (E.D.N.Y.1983), the court noted that the plaintiff presented no evidence at all of either the likelihood of or actual confusion. Similarly, none of the following cases relied on by Novak involved surveys demonstrating confusion: *Bi–Rite Enters., Inc. v. Button Master,* 555 F.Supp. 1188, 1196 (S.D.N.Y.1983) ("plaintiffs have not even attempted to prove confusion in the sense required by the [Lanham] Act"); *Reddy Communications, Inc. v. Environmental Action*

---

628 F.2d at 507 (5th Cir.1980) (515 interviewees sufficient); *SquirtCo,* 628 F.2d at 1089–90 n. 4 (628 survey respondents sufficient); *James Burrough Ltd.,* 540 F.2d at 277 (five hundred interviewees sufficient).

We should also note that the survey was carefully examined at the District Court level. *See* Trial Transcript at 29–116. The District Court did not merely assume that the survey was valid, but considered it with great care and determined that it was probative evidence of consumer confusion.

**6.** The survey in the present case does not suffer from flaws such as those found in the survey in *Jordache Enters., Inc. v. Hogg Wyld, Ltd.,* 625 F.Supp. 48, 54 (D.N.M.1985), *aff'd,* 828 F.2d 1482 (10th Cir.1987).

**7.** The dissent disagrees with our acceptance of the District Court's finding concerning this *SquirtCo* factor, *post* at 404 n. 1, but does not even attempt to demonstrate that the finding is clearly erroneous. Moreover, the dissent seems to misunderstand the focus of our discussion of

this *SquirtCo* factor. Our point is simply that once a consumer has drawn the inference that Mutual is affiliated with Novak's design, inspection of Novak's products will not yield information sufficient to dispel the misperception; that is, the consumer remains confused. This is the appropriate focus, for this factor is intended to discern "whether the degree of care exercised by the purchaser can eliminate the likelihood of confusion [that] would otherwise exist." *SquirtCo,* 628 F.2d at 1091 (quoting *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1342 (2d Cir.1975)). Such a focus implicitly speaks to trademark law concerns not addressed by the dissent's comment, such as whether consumers are being protected from misleading information as to source, affiliation, or sponsorship. *See Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.,* 725 F.2d 336, 348 (5th Cir.1984). The dissent's comment speaks only to whether consumers, upon seeing Novak's design, would "base" their decision to buy insurance on what they perceive to be Mutual's stance on nuclear war. *See post* at 404 n. 1.

*Found., Inc.,* 199 U.S.P.Q. (BNA) 630, 635–36 (D.D.C.1977) (no surveys or evidence of actual confusion); *General Mills, Inc. v. Henry Regnery Co.,* 421 F.Supp. 359, 361 (N.D.Ill.1976) ("no ... evidence of actual confusion and no surveys of consumer attitudes were presented by plaintiff"); *Girl Scouts of United States v. Personality Posters Mfg. Co.,* 304 F.Supp. 1228, 1231 (S.D.N.Y.1969) ("not a scintilla [of evidence] has been presented supporting the allegation of confusion or its likelihood"). In *Jordache,* there was a survey, but the survey was given little weight because it had been shown to be seriously defective. *See Jordache Enters., Inc. v. Hogg Wyld, Ltd.,* 625 F.Supp. 48, 54 (D.N.M.1985), *aff'd,* 828 F.2d 1482 (10th Cir.1987) (court finds problems with survey's setting, sample size, methodology, and computations). Similarly, in *American Footwear,* the Second Circuit affirmed a district court's rejection of survey evidence, finding "numerous deficiencies inherent in the surveys." *American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 663 (2d Cir. 1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980).

■ Novak argues that his use of the design in question is an exercise of his right of free speech and is protected by the First Amendment. We believe, however, that the protection afforded by the First Amendment does not give Novak license to infringe the rights of Mutual. Mutual's trademarks are a form of property, *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 413, 36 S.Ct. 357, 360, 60 L.Ed. 713 (1916); *Hamilton–Brown Shoe Co. v. Wolf Bros. & Co.,* 240 U.S. 251, 259, 36 S.Ct. 269, 271, 60 L.Ed. 629 (1916); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206 (2d Cir.1979); J. McCarthy, *Trademarks and Unfair Competition* § 2:6 (1973), and Mutual's rights therein need not "yield to the exercise of

First Amendment rights under circumstances where adequate alternative avenues of communication exist." *Lloyd Corp. v. Tanner,* 407 U.S. 551, 567, 92 S.Ct. 2219, 2228, 33 L.Ed.2d 131 (1972); *accord Dallas Cowboys Cheerleaders, Inc.,* 604 F.2d at 206; *see also Walt Disney Prods. v. Air Pirates,* 581 F.2d 751, 758–59 (9th Cir.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979); *Reddy Communications, Inc.,* 199 U.S.P.Q. (BNA) at 634. Given the circumstances of this case, Mutual's property rights should not yield. The injunction our decision upholds prohibits Novak's conduct only insofar as Novak uses Mutual's marks as logos or "to market, advertise, or identify [his] services or products." Designated Record (D.R.) at 76–77. Other avenues for Novak to express his views exist and are unrestricted by the injunction; for example, it in no way infringes upon the constitutional protection the First Amendment would provide were Novak to present an editorial parody in a book, magazine, or film. Because the injunction leaves open many such avenues of expression, it deprives neither Novak nor the public of the benefits of his ideas. We therefore conclude that in the circumstances of this case failure to protect Mutual's trademark rights would amount to an "unwarranted infringement of property rights," for it would "diminish [those] rights without significantly enhancing the asserted right of free speech." *Lloyd Corp.,* 407 U.S. at 567, 92 S.Ct. at 2228. *See Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 578, 97 S.Ct. 2849, 2859, 53 L.Ed.2d 965 (1977). It follows that the District Court did not violate Novak's First Amendment rights by issuing the injunction. *See Lloyd Corp.,* 407 U.S. at 567–70, 92 S.Ct. at 2228–29 ("accommodations" must be made between speech and property rights);[8] *Zacchini,* 433

---

8. The dissent takes the view that it is inappropriate to cite in support of our analysis a case where the property in question was real estate rather than a trademark. *Post* at 406 (quoting Note, *Trademark Parody: A Fair Use and First Amendment Analysis,* 72 Va.L.Rev. 1079, 1111–12 (1986) and Denicola, *Trademarks as Speech: Constitutional Implications of the*

*Emerging Rationales for the Protection of Trade Symbols,* 1982 Wis.L.Rev. 158, 206). The crux of the argument is that because the parodist expresses ideas through use of the trademark, an injunction against using a trademark for parody restricts what the parodist may say. Thus, in contrast to cases involving real estate, where courts merely impose restrictions on the

U.S. at 569–79, 97 S.Ct. at 2854–59 (1977) (resolution of conflicts between speech and property rights requires balancing of interests).[9]

We conclude that the District Court's finding of a likelihood of confusion between Mutual's valid trademarks and Novak's design is not clearly erroneous. That finding warrants the District Court's issuance of a permanent injunction restricting Novak's further use of his infringing design.[10] *Pure Foods, Inc. v. Minute Maid Corp.*, 214 F.2d 792, 797 (5th Cir.), *cert. denied*, 348 U.S. 888, 75 S.Ct. 208, 99 L.Ed. 697 (1954); *see also SquirtCo*, 628 F.2d at 1091.[11]

The judgment of the District Court is affirmed.

HEANEY, Circuit Judge, dissenting.

I respectfully dissent. In my view, the trial court's finding that there exists a likelihood of confusion is clearly erroneous. Moreover, the majority's holding sanctions a violation of Novak's first amendment rights. The T-shirts simply expressed a political message which irritated the offi-

cers of Mutual, who decided to swat this pesky fly buzzing around in their backyard with a sledge hammer (a federal court injunction). We should not be a party to this effort.

In regard to the majority's interpretation of the six *SquirtCo* factors indicating a likelihood of confusion: The Mutual trademark is no doubt a strong one. There also is a superficial "similarity" between Mutual's mark and the Novak design. Clearly for a parody to be successful, some similarity must be present, but the differences here are unmistakable: an emaciated human replaces the virile "Indianhead" and "Mutant" replaces "Mutual." Moreover, the products on which the design and mark are used are simply not "competitive," indirectly or otherwise. Mutual sells insurance; Novak sells T-shirts—probably to peace activists. Further, Novak had no intent to pass the T-shirts as Mutual's product.

The only *SquirtCo* factor really in dispute in this case is whether consumers could be "actually confused" as to who sponsored or produced the T-shirts.

time, place, and manner of speech, when courts in trademark parody cases forbid the use of trademarks as the grist for parody they restrict the content of speech. *See* Note, *supra*, at 1111–12; Denicola, *supra*, at 206. This argument may have merit, but it does not apply to the present case. The injunction at issue does not quash most uses to which Novak might wish to put his design, nor does it require that the design be altered. Novak is prohibited from using the design only in the specific commercial ways mentioned in the injunction. His right to use the design in other ways—such as in antinuclear pamphlets and the like—is not restricted in any manner whatsoever.

9. Our analysis is not at odds with *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26 (1st Cir.), *appeal dismissed*, —— U.S. ——, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987). *L.L. Bean* involved "editorial or artistic" use of a mark "solely for noncommercial purposes," *id.* at 32, and the holding did not encompass the likelihood of confusion issue. *Id.* at 32 n. 3 (court notes in dictum that "a parody which engenders consumer confusion would be entitled to less protection than is granted by our decision today"). By contrast, our case centers on Novak's commercial use of Mutual's marks in a way that causes consumer confusion.

10. The dissent suggests that we are imposing liability for "satiric appropriation," *post* at 405,

and in support of this assertion cites Dorsen, *Satiric Appropriation and the Law of Libel, Trademark, and Copyright: Remedies Without Wrongs*, 65 B.U.L.Rev. 923, 964 (1985). But, according to Dorsen, courts do this in trademark cases only when they abandon "the traditional trademark infringement test—likelihood of confusion." *Id.* at 951. We, of course, have not abandoned this test but use it as the foundation for our decision. *See supra* pp. 398–401. Consonant with our holding, Dorsen writes that where likelihood of consumer confusion can be shown, the law should and does provide remedies. *Dorsen, supra*, at 952, 964.

11. The dissent implies that before an injunction may properly be issued, the complaining party must show some sort of harm other than infringement of its trademark rights. *See post* at 404. That is simply not the law. "In trademark infringement, it is not necessary for plaintiff to prove actual damage or injury to obtain injunctive relief." J. McCarthy, *supra* p. 402, § 30:5. Injury is presumed once a likelihood of confusion has been established. *James Burrough Ltd.*, 540 F.2d at 276. All that the complaining party must do to establish its right to an injunction is to prove the likelihood of confusion. J. McCarthy, *supra* p. 402, § 30:5.

The evidence on this issue consisted solely of a survey by a nationally recognized firm. Four hundred persons over the age of twenty-one were interviewed at shopping malls in New York, Denver, Chicago and San Francisco. Neither T-shirts nor insurance were featured at the shopping malls where the interviews were conducted. No one was asked whether he or she was interested in buying a T-shirt or insurance.

The interviewees were shown the T-shirts described in the majority opinion and asked: "Does anything come to your mind when you look at this tee shirt?" Ninety-two percent said yes. Plaintiff's Exhibit No. 49, p. 21. Those answering yes, were then asked: "What comes to your mind when you see this tee shirt?" Twenty-one percent answered Mutual of Omaha, or the TV program Wild Kingdom sponsored by Mutual. Plaintiff's Exhibit No. 49, p. 22. Interviewees were then asked, "anything else," and an additional eight percent then mentioned Mutual of Omaha. Plaintiff's Exhibit No. 49, p. 22.

As recognized by the majority, the only possible evidence of actual confusion is contained in the following question: "Would you say that Mutual of Omaha goes along with or does not go along with these tee shirts in order to make people aware of the nuclear war problem?" Plaintiff's Exhibit No. 49, p. 25. Twelve percent of those who mentioned Mutual of Omaha in the earlier questions gave an affirmative answer to this question.

This survey question, however, is fundamentally flawed and should be given little evidentiary weight. The question is blatantly suggestive. It plants the idea of nuclear war in the mind of the interviewee. Thus, an interviewee who only casually glances at the T-shirt or who doesn't understand the message in the T-shirt is tipped off by the question that the T-shirt has something to do with nuclear war. But, if the interviewer had not tipped these people off about the message on the T-shirts, many would never have even come to the misconception that Mutual sponsored the message on the T-shirt.

The only class of interviewees that really matter in this case are those who, *on their own*, recognized the T-shirt contained a message about nuclear war and also believed that Mutual sponsored it. This survey gives us no firm data on how many of these interviewees there were, except that the percentage is somewhere from zero to twelve percent. That is not compelling evidence. *See Jordache*, 828 F.2d at 1487–88. It is at most an inference of the possibility of confusion, and such a showing is not sufficient to prove infringement. *Jordache*, 828 F.2d at 1482.

The survey suffers from additional flaws. The sample was miniscule and taken in areas that Novak's message had not reached and had no realistic chance of reaching. His "mom and pop" operation reached a few thousand people, nearly all of whom lived in the Omaha area. Mutual, on the other hand, operates throughout the United States and sells nearly two billion dollars of insurance each year to millions of men and women.

There is not a whit of evidence that either Mutual's sales or its image suffered to any degree, or more importantly that Novak did or could do anything that would be likely to cause confusion among the millions of policyholders of Mutual or those in the pool likely to purchase insurance.[1]

There can be no doubt that Novak used the "Mutant of Omaha" design in a satiri-

---

1. I simply cannot go along with the majority's acceptance of the district court's finding that "consumers are not likely to exercise the 'high degree of care or thought' necessary to 'distinguish Mutual from the message on [Novak's] products." *Supra* at 401. As I stated previously, we do not know how many of the survey interviewees, *on their own*, recognized the message about nuclear war, and believed Mutual sponsored it. But, if there are some in this category, I simply cannot believe that any significant number would base an important decision such as buying insurance on their notion that Mutual took a stance on nuclear war. *Cf. Jordache*, 828 F.2d at 1487 (district court's finding that customers are likely to exercise a "high degree of care in purchasing clothing that costs between fifteen and sixty dollars" is not clearly erroneous). Moreover, of those who would be influenced by the misconception, it is entirely likely that a fair number would view a stance against nuclear war quite favorably.

cal manner. He intended to expose what he considered the folly of nuclear war. He did not intend to harm Mutual's reputation, and there is no evidence that he did so or was likely to do so.

Most importantly, the majority opinion cannot be squared with the first amendment. The Supreme Court has consistently held that prior restraints on publication are presumptively invalid and may be sustained only under the most extraordinary circumstances. *Lowe v. SEC,* 472 U.S. 181, 204–05, 105 S.Ct. 2557, 2570–71, 86 L.Ed.2d 130 (1985).[2] These are not extraordinary circumstances.

The majority justifies its assault on Novak's first amendment rights by stating that "protection afforded by the first amendment does not give Novak license to violate the [property] rights of Mutual where adequate alternative avenues of communication exist." Unfortunately, neither the district court nor the majority identifies how Mutual's property rights were harmed by the message on the T-shirts—its feelings, yes, but its reputation, highly unlikely.

Scholarly opinion rejects the loose definition of property damage taken by the majority. One commentator has said:

> By extending protection to cases outside the existing legal framework and imposing liability for "satiric appropriation," courts have stifled creativity without protecting any legally recognized rights. Courts must realize that satire is a special form of expression and evaluate it under established rules rather than according to personal reactions. Strict application of traditional rules of law will protect all parties. A good satire will likely offend someone. Good law, however, must allow the offense.

H. Dorsen, *Satiric Appropriation and the Law of Libel, Trademark, and Copyright: Remedies Without Wrongs,* 65 B.U.L.Rev. 923, 964 (1985).

Scholarly opinion also rejects the notion that product parodists must use "adequate

alternative avenues of communication." One writer considers many of the cases relied on by the majority, *see, e.g., Mutual of Omaha Ins. Co. v. Novak,* 775 F.2d 247, 249 (8th Cir.1985); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206 (2d Cir.1979); *L.L. Bean, Inc. v. Drake Publications, Inc.,* 625 F.Supp. 1531, 1537–38 (D.Me.1986); *Reddy Communications, Inc. v. Environmental Action Found.,* 477 F.Supp. 936 (D.D.C. 1979), and he cogently explains why "trademark parody" must be distinguished from other kinds of intrusions on another's property:

> [T]he courts have uncritically relied on the characterization of trademarks as a type of "private property," leading them to the conclusion that, even if the first amendment does apply to trademark parody, the property rights of the trademark owner must take precedence over the parodist's right of free expression because the latter can always communicate his ideas in ways that do not require the use of the trademark itself. Here the property metaphor, useful in other contexts, completely distorts the analysis, causing courts to hold, in essence, that the parodist's rights must yield to property rights whenever the parodist has adequate alternative avenues of communication. This notion derives from the Supreme Court's decision in *Lloyd Corp. v. Tanner.* There the Court held that the owner of real property has the right to exclude unwelcome speakers from that property. But in the *Lloyd* situation, the owner's enforcement of its property rights restricts only the *place* where the speaker's expression may occur. Giving precedence to the owner's property rights comports with the doctrine that a restriction on the time, place, or manner of expression is valid so long as it leaves the speaker with an alternative means of delivering his message. Application of this rule is distinctly inappropriate, however, when the property

**2.** *See also* J.T. McCarthy, *Trademarks and Unfair Competition* § 31.38 (2d ed. 1984); R. Denicola, *Trademarks as Speech: Constitutional Implications of the Emerging Rationales for the Protection of Trade Symbols,* 1982 Wis.L.Rev. 158, 202–207.

involved is not real estate but a trademark—a form of intangible property that *itself* conveys or symbolizes ideas. Because a parodist expresses ideas through the use of another's trademark, the owner's attempt to enjoin the parody goes to the *content* of the speech and not merely to the time, place, or manner of its delivery.

Note, *Trademark Parody: A Fair Use and First Amendment Analysis*, 72 Va.L. Rev. 1079, 1111–1112 (1986) (footnotes omitted).

I agree with Professor Robert Denicola that the general approach to trademark parodies should be this:

> If the injury to the plaintiff's trademark arises from the ideas that have been expressed through the defendant's use, it is no answer to cite the "shopping center" cases [allowing restrictions on time, place and manner] to justify suppression on the ground that "adequate alternative avenues of communication exist." The issue is not *where* the defendant may speak, but rather *what* he may say. The first amendment will not permit the trademark owner the power to dictate the form, and thus the effectiveness, of another's speech simply because his trademark has been used to express ideas that he would prefer to exclude from the public dialogue.

R. Denicola, *Trademarks as Speech: Constitutional Implications of the Emerging Rationales for the Protection of Trade Symbols*, 1982 Wis.L.Rev. 158, 206.

In sum, the evidence in this case shows at most a possibility of trademark confusion, no real evidence of actual harm to property, and, most importantly, a significant intrusion upon the defendant's first amendment rights. For these reasons, I dissent.